NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 10-2145
_____

UNITED STATES OF AMERICA

v.

RAYMOND JACKSON,

Appellant

_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. Crim. No. 2-09-cr-00085-001)
Honorable David Stewart Cercone, District Judge

_____

Submitted under Third Circuit LAR 34.1(a)
December 16, 2011

BEFORE:  SLOVITER, VANASKIE, and GREENBERG, Circuit Judges

(Filed: December 30, 2011)
_____

OPINION OF THE COURT
_____

GREENBERG, Circuit Judge.

## I. INTRODUCTION

This matter comes on before this Court on appeal from a judgment of conviction

and sentence entered in the District Court on April 17, 2010, following defendant-

appellant Raymond Jackson's conditional plea of guilty to an indictment charging him

with being a convicted felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(e). Jackson entered his plea after the Court denied his motion to suppress evidence of the firearm but in doing so reserved his right to appeal from the order denying his motion. The Court sentenced Jackson to a custodial term of 188 months to be followed by a five-year term of supervised release. Jackson's sole contention on this appeal is that the Court erred in denying his motion to suppress because in his view the arresting officers seized the firearm in violation of his right under the Fourth Amendment to be free from an unreasonable search and seizure. As we shall explain, the circumstance that the arrest was not effectuated until after the seizure of the weapon dooms this appeal.

The District Court had jurisdiction under 18 U.S.C. § 3231 and we have jurisdiction under 28 U.S.C. § 1291. In view of the circumstance that we are deciding this case on the basis of undisputed facts we are exercising plenary review. See United States v. Givan, 320 F.3d 452, 458 (3d Cir. 2003).

This is what happened. On April 23, 2008, Wilkinsburg, Pennsylvania police officers received and responded to a dispatch call advising them of a report of shots having been fired in the 500 block of Midland Street in Wilkinsburg. Sergeant Daniel Cuiffi and Officer Michael Bender traveling in separate vehicles responded to the call. Cuiffi, who was alone, was driving the lead vehicle and Bender, who also was alone, was close behind Cuiffi. A third officer, Detective Charles Knox, was in a vehicle close behind Bender's vehicle. The three vehicles were essentially in a line. While the police were on their way to the scene of the reported shots, they received an additional dispatch

2

reporting that a green vehicle might have been involved in the incident. As the officers were driving on Dell Way, Jackson was driving a green vehicle on the same street as the officers but was going in the opposite direction away from the scene of the reported shooting incident.

As Cuiffi passed Jackson, Cuiffi recognized him from previous encounters and saw that Jackson was driving a green vehicle which, as the police subsequently learned, he did not own. Cuiffi knew that Jackson had a criminal history and believed, correctly as it turned out, that Jackson did not have a driver's license. Cuiffi then radioed Bender and told him to stop Jackson's vehicle and Bender did so. After the stop, Bender exited his vehicle and spoke to Jackson who initially remained seated inside his vehicle. At the suppression hearing, Bender indicated that Jackson's right hand was gloved and faced "toward the floorboard of the vehicle," app. at 121, circumstances that made Bender "very curious as to why [Jackson] did that and very concerned as to why his hand was toward the floor of the car." Id. Accordingly, Bender asked Jackson to exit the vehicle because Bender was "concerned for [his] safety as well as [Jackson's]." Id. at 122. Jackson then got out of the vehicle.

In the meantime, Cuiffi, who stopped close by, exited his vehicle and approached Jackson's vehicle. Cuiffi explained to Jackson why the police had stopped him and said the Jackson was making him nervous because it appeared that Jackson "was getting ready to run." Id. at 124. Cuiffi observed that Jackson was looking around and appeared to be very nervous when he got out of the vehicle. Cuiffi's concern about Jackson fleeing is

3

understandable because on a previous occasion when Cuiffi was attempting to arrest him Jackson had fled.

In view of Cuiffi's concerns, he advised Jackson that even though the police were not arresting him they would detain him. Pursuant to their decision to detain him, police handcuffed Jackson because of the report of shots fired, Jackson's behavior, and his prior criminal activity. Nevertheless, when they handcuffed Jackson they did not formally place Jackson under arrest and they did not tell him that he was under arrest.

While Jackson was being detained, Knox exited his vehicle and walked up to the other two officers and asked if they needed assistance. Bender informed Knox that when he saw Jackson he was reaching down toward the front seat area in the direction of the floor. Bender, however, did not see a weapon when he looked inside Jackson's vehicle. Bender informed Knox that he was "extremely concerned as to Mr. Jackson's actions" and about "his hand and where it was . . . when he was inside the vehicle." Id. at 135-36. Bender asked Knox to "look in the car and see if there's anything in there." Id. at 170. None of the officers sought Jackson's permission to search his vehicle.

Knox looked into the vehicle and then, after stooping down and entering the vehicle, he saw the handle of a firearm. Knox then took the firearm from the driver's compartment of the vehicle. During the time that Knox was looking into Jackson's vehicle, Jackson was standing with Sergeant Cuiffi at the rear driver's side corner of the vehicle. At that time Bender was on one side of Jackson and Cuiffi was on the other side. The police arrested Jackson after Knox recovered the firearm.

4

Jackson does not contend that the police did not have a right to stop his vehicle. In this regard, we point out that the facts in this case are unusual in that the police before stopping Jackson recognized him as the driver of the green vehicle and believed that he did not have a driver's license. Ordinarily, of course, when stopping a vehicle the police do not know the driver's identity and thus cannot know if the driver is licensed to drive. Indeed, it seems clear that when Cuiffi observed Jackson driving, that even without regard for the report of shots being fired, the police had a duty to stop him as Cuiffi believed that Jackson was driving without a driver's license and the police hardly could permit him to drive away in those circumstances.

Of course, the fact that the police lawfully could stop Jackson does not mean, without more, that they had a right to search his vehicle. The police, however, were confronted with a situation in which they had stopped a driver going in a direction away from the scene of a reported shooting incident in a vehicle that at least to the extent of its color was similar to a vehicle reported to be involved in the incident. Moreover, the police were aware of Jackson's criminal background which included being involved with weapons and his suspicious conduct after they stopped him. Thus, they had reasonable grounds to be concerned about their safety, including, in particular, concerns about the contents of the vehicle.

In Jackson's brief he acknowledges that under Michigan v. Long, 463 U.S. 1032, 1049, 103 S.Ct. 3469, 3481 (1983), a police officer may conduct a protective search of a vehicle following a lawful investigatory stop if there are "specific and articulable facts" to indicate that the driver is dangerous and may gain immediate control of a weapon.

5

Appellant's br. at 13. The facts that we have recounted satisfy this test. Jackson cites Arizona v. Gant, 556 U.S. 332, 129 S.Ct. 1710 (2009), in support of his appeal. We have indicated that we understand Gant to hold that police cannot search a location or item solely as incident to an arrest "when there is no reasonable possibility that the suspect might access it." United States v. Shakir, 616 F.3d 315, 320 (3d Cir. 2010). Gant, however, as we indicated in Shakir, dealt with a search incident to an arrest. Of course, when there is an arrest the arrestee's access to the location to be searched, if not eliminated, at least is restricted. Here, however, the police did not arrest Jackson prior to the search and thus at some point if they did not arrest him they would have released him and he might then have had unrestricted access to his vehicle even if he could not drive it. Thus, Gant is distinguishable from this case. Accordingly, the circumstance that the police did not arrest Jackson prior to the search made it more rather than less imperative for them to search his vehicle so as to deprive him of the opportunity to reach for a weapon if there was one in the vehicle. Overall, after considering the facts here we are satisfied that the search was reasonable and thus the District Court did not err in denying Jackson's motion to reopen.

In reaching our conclusion we do not doubt that there is an objective element in determining whether when the police take a person into custody the custody rises to the level of an arrest regardless of what the police intend or say at the time. Cf. Berkemer v. McCarty, 468 U.S. 420, 436-37, 104 S.Ct. 3138, 3148 (1984) (The Supreme Court has "long acknowledged that stopping an automobile and detaining its occupants constitute a seizure within the meaning of the Fourth Amendment . . . .") (internal quotation marks

6

and brackets omitted). Nevertheless, it seems to us that even though the police handcuffed Jackson before they recovered the firearm, we should not regard his initial custody as an arrest even if we evaluate the custody objectively as we see no reason to conclude that the police intended to detain Jackson beyond the time necessary to investigate whether he was involved in the shots fired incident. After all, if they intended to do so they could have arrested Jackson for driving without a license from the time they stopped him as Cuiffi believed from the outset that Jackson was unlicensed.[1]

Finally, we note that the government argues that regardless of whether the seizure of the firearm initially was lawful, the District Court correctly denied Jackson's motion to suppress because the police inevitably would have discovered the firearm through other lawful means. It predicates this argument on the circumstances that because Jackson was driving without a license and did not own the vehicle he had been operating, if the police had not arrested Jackson they nevertheless would have impounded his vehicle and, in doing so, they would have made a lawful inventory search in which they would have found the firearm. See United States v. Mundy, 621 F.3d 283, 287-88 (3d Cir. 2010), cert. denied, 131 S.Ct. 1531 (2011). Inasmuch as the firearm was not hidden in an obscure place in the vehicle but rather was in a place where Knox easily could see it when he entered Jackson's vehicle, the government's inevitable discovery argument is very strong. Nevertheless, we have no need to decide definitively whether the inevitable

---

[1] We are not implying that our conclusion as to the lawfulness of the seizure would have been different if we concluded that regardless of what they intended and told Jackson the police in fact arrested him before Knox found the firearm. Rather, we express no opinion on that possibility.

discovery rule is applicable here so as to have required the denial of the motion to suppress as we are upholding the seizure of the firearm on the grounds that it was lawful from the outset.

The judgment and conviction and sentence entered April 17, 2010, will be affirmed.