PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———

No. 09-2665

———

UNITED STATES OF AMERICA

v.

NAIM NAFIS SHAKIR,
a/k/a Naim Shakir
a/k/a James Perry

NAIM NAFIS SHAKIR,
                                    Appellant

———

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 07-cr-00488)
District Judge:  Honorable Anita B. Brody

———

Argued April 13, 2010
Before: FISHER, HARDIMAN and COWEN, *Circuit Judges*.

(Filed: August 10, 2010)

Joseph F. Minni [Argued]
Office of United States Attorney
615 Chestnut Street
Suite 1250
Philadelphia, PA 19106-0000
          *Attorney for Appellee*

Christy Unger [Argued]
David L. McColgin
James J. McHugh, Jr.
Leigh M. Skipper
Brett G. Sweitzer
Defender Association of Philadelphia
Federal Court Division
601 Walnut Street
The Curtis Center, Suite 540 West
Philadelphia, PA 19106-0000
          *Attorneys for Appellant*

———

OPINION OF THE COURT

———

HARDIMAN, *Circuit Judge*.

In this appeal we consider the legality of a warrantless search incident to arrest in light of the Supreme Court's decision in *Arizona v. Gant*, 129 S. Ct. 1710 (2009).

I.

On May 22, 2007, a Pennsylvania state magistrate judge issued an arrest warrant for Naim Nafis Shakir, who police believed was involved in an armed robbery of a PNC Bank a month earlier. The warrant was promptly entered into the database of the National Crime Information Center and came to the attention of Federal Bureau of Investigation agents in Pennsylvania. Because those agents believed Shakir had gambling ties to Atlantic City, New Jersey, they enlisted the help of FBI Special Agent Joseph Furey in New Jersey.

The following day, Special Agent Furey learned that Shakir had recently stayed in the Trump Plaza Hotel and Casino. In response, Furey asked Atlantic City Police Detective David Smith, who was assigned to an FBI task force, to investigate the lead. Detective Smith visited the Trump Plaza and was informed that not only had Shakir been gambling at the casino the previous day, but he was expected to check into the hotel at 4:00 that afternoon. Since it was already around 2:00 p.m., Smith immediately notified Special Agent Furey, who began to organize a team to arrest Shakir upon his appearance at the hotel. Before the arrest team arrived, however, security spotted Shakir entering the hotel. When he learned this, Smith asked Special Agent Furey to expedite his arrival to effectuate the arrest. Smith also called the Atlantic City Police to request a squad car. Smith then proceeded to the lobby with two hotel security personnel; all three were dressed in plainclothes.

Soon after he entered the lobby, Detective Smith spotted Shakir standing at the end of the check-in line some 25 feet

3

away, holding a gym bag. As Smith drew closer to Shakir, he heard a man about 15 feet away yell "shit!," which Smith took as a warning to Shakir. Although Shakir turned as if to respond, he simply maintained eye contact with the shouter. Meanwhile, Detective Smith asked the hotel security agents, both of whom were unarmed, to detain Shakir's apparent confederate while Smith hurried over to Shakir, grabbed his arm, and placed him under arrest. Shakir complied and dropped his bag on the floor at his feet.

Detective Smith immediately patted down Shakir and found no weapons on his person. Smith attempted to handcuff Shakir, but was unable to do so because of Shakir's girth. Indeed, Shakir advised Smith that police "usually use three sets of handcuffs." Shakir was polite and compliant during the arrest, and after the initial excitement, the arrest was "very low key." There were approximately 20 people in the hotel lobby during and following the arrest.

Within five minutes of Shakir's initial arrest, two armed police officers arrived with handcuffs which Smith used to restrain Shakir. While the other officers held Shakir by the arms, Smith bent down to investigate the contents of the bag at Shakir's feet. Therein Smith found clothes and a large amount of cash, but no weapons. Some of the cash in the bag was later identified as having been stolen during an armed robbery of the Belco Credit Union in Lancaster, Pennsylvania on May 21, 2007 (not from the PNC Bank robbery that prompted the warrant for Shakir's arrest).

Shakir was indicted on one count of armed robbery of the Belco Credit Union in violation of 18 U.S.C. §§ 2113(d) and 2. Prior to trial, Shakir filed a motion to suppress evidence, claiming Detective Smith's search of his gym bag violated his Fourth Amendment right to be free from unreasonable searches. After the District Court denied the motion, Shakir proceeded to trial and was convicted by a jury.

## II.

The District Court had jurisdiction under 18 U.S.C. § 3231 and we have jurisdiction under 28 U.S.C. § 1291. We review the District Court's factual findings for clear error, and we exercise plenary review over its application of law to those facts. *United States v. Bond*, 581 F.3d 128, 133 (3d Cir. 2009).

## III.

Shakir's sole argument on appeal is that the cash found by police was inadmissible at trial because it was the fruit of an illegal search. The Government counters that it conducted a legal search incident to arrest. Under this well-recognized exception to the warrant requirement of the Fourth Amendment, "[w]hen an arrest is made, it is reasonable for the arresting officer to search the person arrested in order to remove any weapons that the latter might seek to use in order to resist arrest or effect his escape." *Chimel v. California*, 395 U.S. 752, 762-63 (1969). The permissible scope of a search incident to arrest includes "the arrestee's person and the area 'within his immediate control'—construing that phrase to mean the area

from within which he might gain possession of a weapon or destructible evidence." *Id.* at 763.

The crux of Shakir's appeal is that because he was already handcuffed at the time Detective Smith searched his bag, he had no access to any weapon or destructible evidence that might have been in the bag. The Government responds by citing several appellate decisions upholding searches incident to arrest conducted after the suspect was handcuffed. *See, e.g., Virgin Islands v. Rasool*, 657 F.2d 582, 584-85, 588-89 (3d Cir. 1981); *United States v. Horne*, 4 F.3d 579, 587 (8th Cir. 1993); *United States v. Nohara*, 3 F.3d 1239, 1243 (9th Cir. 1993); *United States v. Helmstetter*, 56 F.3d 21, 23 (5th Cir.1995); *United States v. Mitchell*, 64 F.3d 1105, 1110-11 (7th Cir. 1995); *United States v. Abdul-Saboor*, 85 F.3d 664, 668-69 (D.C. Cir. 1996). These decisions followed a general trend among the courts of appeals, following the Supreme Court's decision in *New York v. Belton*, 453 U.S. 454, 460 (1981), toward a rule that although "the search is limited to the area under the defendant's control at the time of his arrest, the fact that it is no longer under his control at the time of the search does not invalidate the search." *United States v. Tejada*, 524 F.3d 809, 812 (7th Cir. 2008); *see also Abdul-Saboor*, 85 F.3d at 669 ("[I]f the courts were to focus exclusively upon the moment of the search, we might create a perverse incentive for an arresting officer to prolong the period during which the arrestee is kept in an area where he could pose a danger to the officer."); *United States v. McLaughlin*, 170 F.3d 889, 893 (9th Cir. 1999); *United States v. Currance*, 446 F.3d 554, 557 (4th Cir. 2006) ("[O]fficers may separate the suspect from the item to be searched, thereby

alleviating their safety concerns, before they conduct the search.") (citation, quotation marks and alteration omitted).

Like the District Court's decision denying Shakir's motion to suppress, however, the cases upon which the Government relies all predated the Supreme Court's decision in *Arizona v. Gant*, 129 S. Ct. 1710 (2009), which narrowed the scope of the search-incident-to-arrest doctrine. In *Gant* the Supreme Court held that officers could not search an arrestee's car after he had been removed from the vehicle and secured, noting that "[t]o read *Belton* as authorizing a vehicle search incident to every recent occupant's arrest would thus untether the rule from the justifications [i.e., officer safety and preventing the destruction of evidence] underlying the *Chimel* exception." *Gant*, 129 S. Ct. at 1719. Accordingly, the *Gant* Court concluded that searches of a suspect's automobile are not permitted incident to an arrest when the police "could not reasonably have believed . . . that [the arrestee] could have accessed his car at the time of the search." *Id*.

Because *Gant* involved an automobile search, and because it interpreted *Belton*, another automobile case, the Government contends that the rule of *Gant* applies only to vehicle searches. We do not read *Gant* so narrowly. The *Gant* Court itself expressly stated its desire to keep the rule of *Belton* tethered to "the justifications underlying the *Chimel* exception," *id.*, and *Chimel* did not involve a car search. Moreover, as we noted above, many courts of appeals perceived *Belton* to establish a relaxed rule for searches incident to arrest in all contexts. *See, e.g.*, *Tejada*, 524 F.3d at 812 (applying *Belton* to search of a cabinet in a home); *Abdul-Saboor*, 85 F.3d at 669

7

(applying *Belton* to an apartment search). Because *Gant* foreclosed such a relaxed reading of *Belton*, there is no plausible reason why it should be held to do so only with respect to automobile searches, rather than in any situation where the item searched is removed from the suspect's control between the time of the arrest and the time of the search. Although this Court has never explicitly adopted a "time of the arrest" rule like that adopted in the aforementioned cases, we do read *Gant* as refocusing our attention on a suspect's ability (or inability) to access weapons or destroy evidence at the time a search incident to arrest is conducted.

It is in this vein that Shakir points to our decision in *United States v. Myers*, 308 F.3d 251 (3d Cir. 2002), which we regard as being consistent with *Gant* despite predating it. In *Myers*, a single policeman responded to a 911 call reporting a disturbance involving a gun in an apartment. *Id.* at 253. Upon arriving at the scene, he found the defendant hiding. The defendant came out and laid face down on the floor when ordered, throwing a bag down three feet away from himself in the process. *Id*. The officer handcuffed the defendant and patted him down, finding nothing. Two other officers then arrived, and they took custody of the defendant while the first officer went downstairs to briefly interview a woman who had been arguing with the defendant. *Id.* at 254. The first officer later returned upstairs, where Myers was still lying face down, handcuffed and attended by the two officers. Noticing that Myers was looking at the bag on the floor and acting nervously, the first officer searched the bag and found a gun inside. *Id*.

8

We held that this search was not lawfully incident to Myers's arrest.[1] In doing so, we quoted with approval an opinion of the Court of Appeals for the District of Columbia Circuit which suggested that a search under these circumstances would be valid as incident to the arrest "[a]bsent some objective basis upon which to conclude that the arresting officer had no reason to fear either the arrestee or the environment in which the arrest unfolded." *Id.* at 267 (quoting *United States v. Abdul-Saboor*, 85 F.3d 664, 670 (D.C. Cir. 1996) (emphasis omitted)). We also acknowledged that "where, in the heat of an arrest, an officer concludes that a particular item is within the arrestee's grasp, courts are extremely reluctant to subsequently determine that the officer's conclusion was unreasonable and thereby suppress whatever evidence may have been found." *Id.* at 273. Nevertheless, the facts of Myers's case presented an objective basis to conclude that he was no longer dangerous when the search occurred: he was lying on the floor and guarded by two policemen, he had already been frisked for weapons, the bag that was searched was three feet away from him and zipped shut, and the searching officer had not seen the need to search the bag

___

[1] The Government notes that we also concluded that there was no probable cause to arrest Myers, which was an alternative basis for suppression. The Government therefore argues that our conclusions in *Myers* with respect to the search-incident-to-arrest doctrine were *dicta*. Contrary to the Government's argument, "[w]hen two independent reasons support a decision, neither can be considered obiter dictum; each represents a valid holding of the court." *Kushner v. Winterthur Swiss Ins. Co.*, 620 F.2d 404, 408 n.4 (3d Cir. 1980).

at the time of arrest, but instead went downstairs and interviewed a witness first. *Id*. Significantly for purposes of the instant appeal, we noted that, "[h]ad [the officer] searched the bag . . . before going downstairs, we would have a different set of circumstances to consider against the teachings of *Chimel* and its progeny." *Id*. at 274. We also emphasized that the officer's testimony suggested that he was not concerned about the possible presence of a weapon until after he opened the bag. *Id*. at 274.

As in *Myers*, Shakir was handcuffed and restrained by two policemen at the time his bag was searched. Unlike in *Myers*, however, Shakir was standing up at the time of the search, he was in a public place with some 20 people around, and his bag was right next to him. In addition, the police had reason to believe that one or possibly more of Shakir's accomplices was nearby, and the suspected accomplice Smith had identified was restrained only by two unarmed private security officers. Moreover, Detective Smith did not leave the scene before searching the bag, and he testified that his chief concern in searching the bag was to prevent any weapons that might be inside from being used to injure police or the innocent bystanders in the hotel lobby. As a result, several of the key elements of the objective basis on which we concluded that Myers was no longer dangerous are not present in this case.

Because *Myers* is not binding here, we are left to consider, under *Gant* and other relevant precedents, whether Shakir retained sufficient potential access to his bag to justify a warrantless search. Specifically, we must consider whether the fact that Shakir was handcuffed and guarded by two armed

policemen precluded his access to the contents of the bag. *Gant* makes clear that whether a suspect is "secured" is an important consideration in assessing the lawfulness of a warrantless search. In fact, the *Gant* Court "h[e]ld that the *Chimel* rationale authorizes police to search a vehicle incident to a recent occupant's arrest only when the arrestee is unsecured and within reaching distance of the passenger compartment at the time of the search." *Gant*, 129 S. Ct. at 1719. This language could be read to prohibit the search of the bag unless at the time of the search Shakir was both (1) unsecured *and* (2) within reaching distance of the bag. Under this reading, once a suspect is "secured," no searches would be permitted incident to his arrest, regardless of whether the searched items are within his reaching distance.

We find such an aggressive reading of *Gant* to be unpersuasive, however, because it is inconsistent with the remainder of the *Gant* opinion, with other Supreme Court precedents, and with the valid concern for the safety of police and the public. First, a closer reading of *Gant* reveals that the Court's references to a suspect being "unsecured" and being "within reaching distance" of a vehicle are two ways of describing a single standard rather than independent prongs of a two-part test. In later formulations of its holding, the *Gant* Court omitted any reference to whether Gant was secured or unsecured, and looked instead simply to Gant's ability to access his vehicle. Thus, the Court stated: "[b]ecause police could not reasonably have believed . . . that Gant could have accessed his car at the time of the search . . . the search in this case was unreasonable." *Id.* at 1719. And in its final summation, the Court explained that "[p]olice may search a vehicle incident to

11

a recent occupant's arrest only if the arrestee is within reaching distance of the passenger compartment at the time of the search . . . ." *Id.* at 1723. The conspicuous absence of any mention of the "secured" status of a suspect suggests that the Court did not regard it as an independent element that must be satisfied in order to justify a search incident to arrest. Accordingly, we understand *Gant* to stand for the proposition that police cannot search a location or item when there is no reasonable possibility that the suspect might access it.

Second, if *Gant* is construed to forbid all container searches after a suspect is handcuffed or held by police, it would not only narrow *Belton* but also effectively eliminate a major element of the search-incident-to-arrest doctrine. In *Chimel*, the Supreme Court stated that searches of "the arrestee's person" *and* "the area into which an arrestee might reach" could be aimed at finding weapons the arrestee might use to "effect his escape." 395 U.S. at 763. The Court thus contemplated that such searches would take place after the suspect is restrained in some way. To hold that a container search incident to arrest may not occur once the suspect is under the control of the police, but before he has been moved away from the item to be searched, would eviscerate this portion of *Chimel*. *Gant* did not purport to do any such thing.

Third, we note that handcuffs are not fail-safe. As the Court of Appeals for the Fifth Circuit has stated, it is not true that

> by handcuffing a suspect, the police instantly and completely eliminate all risks that the suspect will

12

flee or do them harm. . . . Handcuffs are a temporary restraining device; they limit but do not eliminate a person's ability to perform various acts. They obviously do not impair a person's ability to use his legs and feet, whether to walk, run, or kick. Handcuffs do limit a person's ability to use his hands and arms, but the degree of the effectiveness of handcuffs in this role depends on a variety of factors, including the handcuffed person's size, strength, bone and joint structure, flexibility, and tolerance of pain. Albeit difficult, it is by no means impossible for a handcuffed person to obtain and use a weapon concealed on his person or within lunge reach, and in so doing to cause injury to his intended victim, to a bystander, or even to himself. Finally, like any mechanical device, handcuffs can and do fail on occasion.

*United States v. Sanders*, 994 F.2d 200, 209 (5th Cir. 1993). The *Sanders* court noted that "in 1991 alone . . . at least four police officers were killed by persons who had already been handcuffed." *Id*. at 209-10. And such incidents continue. *See, e.g.*, United States Dep't of Justice, *2008 Law Enforcement Officers Killed & Assaulted*, http://www.fbi.gov/ucr/killed/2008/summaries.html (follow "TX" link) (officer killed by handcuffed suspect); United States Dep't of Justice, *2006 Law Enforcement Officers Killed & Assaulted*, http://www.fbi.gov/ucr/killed/2006/summaries.html (follow "TX" link) (same). Thus, reading *Gant* to prohibit a

13

search incident to arrest whenever an arrestee is handcuffed would expose police to an unreasonable risk of harm.

For the foregoing reasons, we hold that a search is permissible incident to a suspect's arrest when, under all the circumstances, there remains a reasonable possibility that the arrestee could access a weapon or destructible evidence in the container or area being searched. Although this standard requires something more than the mere theoretical possibility that a suspect might access a weapon or evidence, it remains a lenient standard.

IV.

Applying the legal standard we have enunciated to the facts of this appeal, we conclude that there remained a sufficient possibility that Shakir could access a weapon in his bag to justify its search. Although he was handcuffed and guarded by two policemen, Shakir's bag was literally at his feet, so it was accessible if he had dropped to the floor. Although it would have been more difficult for Shakir to open the bag and retrieve a weapon while handcuffed, we do not regard this possibility as remote enough to render unconstitutional the search incident to arrest. This is especially true when we consider that Shakir was subject to an arrest warrant for armed bank robbery, and that he was arrested in a public area near some 20 innocent bystanders, as well as at least one suspected confederate who was guarded only by unarmed hotel security officers. Under these circumstances, the police were entitled to search Shakir's bag incident to arresting him. Consequently, suppression of the cash

14

found within the bag was not required and we will affirm the judgment of the District Court.