**NOT PRECEDENTIAL**

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 12-1309

_____

UNITED STATES OF AMERICA

v.

MICHAEL MATTHEWS,

Appellant

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(No. 2-09-cr-00612-001)
District Judge: Honorable Gene E.K. Pratter

_____

Argued January 8, 2013

Before: SCIRICA, AMBRO and FUENTES, *Circuit Judges*

(Opinion Filed: July 25, 2013)

Keith M. Donoghue, Esq. **[ARGUED]**
Robert Epstein, Esq.
Federal Community Defender Office for the Eastern District of Pennsylvania
601 Walnut Street
The Curtis Center, Suite 540 West
Philadelphia, PA 19106

    *Counsel for Appellant*

Bernadette A. McKeon, Esq. **[ARGUED]**
Denise S. Wolf, Esq.
Office of United States Attorney

615 Chestnut Street
Suite 1250
Philadelphia, PA 19106

*Counsel for the Appellee*

_____

OPINION

_____

FUENTES, *Circuit Judge*:

Suspecting that Appellant Michael Matthews and another man were about to rob a check cashing store, Philadelphia Police stopped Matthews and conducted a frisk of his person. After learning that Matthews was wanted on two outstanding warrants, he was arrested, and the backpack he was carrying was seized. Officers placed Matthews in the backseat of a police car and opened and searched the backpack prior to placing it in the trunk. Inside, police discovered a handgun, gloves, and duct tape. Before trial, Matthews moved to suppress the evidence recovered, arguing that the warrantless search of his backpack violated the Fourth Amendment. The Government responded that the search was necessary to ensure the safety of the officers. For the following reasons we will affirm the District Court's denial of Matthews' motion to suppress.

## I. BACKGROUND

### A. Surveillance and Arrest

After receiving a tip that several black males wearing burkas—head-to-toe garments traditionally worn by Muslim women—had been loitering outside a check cashing store during opening hours, Philadelphia Police established surveillance outside of the store. On the morning of Friday, June 12, 2009, officers noticed two black men

2

acting suspicious. The officers eventually approached the men, one of whom was Michael Matthews. At the time, Matthews was carrying a green and white striped "suitcase backpack" on one of his shoulders. App. 180; *see* App. 1114A, 1114B (photos of backpack).

Officer Michael Frisco and his partner Officer Joanne Pomeroy, an eight-year veteran of the force, asked Matthews to place his backpack on the ground and put his hands in the air, which he did. Frisco then proceeded to pat-down Matthews and confirmed that he had no weapons on his person. Matthews provided Frisco with identification upon request, and a subsequent warrant check uncovered that Matthews had two active bench warrants—one for theft of services and one for four scofflaw tickets. As a result of the active warrants, Matthews was placed under arrest.

Officer Frisco handcuffed Matthews and walked him across the street to a police car while Officer Pomeroy recovered Matthews' backpack from the ground.[1] After Matthews had been secured in the backseat of the car—handcuffed with the door closed and locked from the outside—Pomeroy opened and searched Matthews' backpack while standing next to the car. Inside she found a roll of duct tape, a pair of gloves, and a .22 caliber handgun.[2] The officers then placed the backpack into the trunk of the police car and transported it, along with Matthews, to the police station for processing.

---

[1] While Matthews was being arrested, another officer approached the car from which Matthews had exited, and looked inside. In the back seat, on the floor boards, he observed "muslim garb." App. 106, 147.

[2] Officer Frisco listed these items on a property receipt, which he prepared at the police station some time later. *See* App. 186-87; Tr. of Jan. 8, 2013 Oral Arg. at 33-34.

**B.      Suppression Hearings**

In January 2010 Matthews was charged in a five-count superseding indictment with one count of conspiracy to commit robbery, in violation of 18 U.S.C. § 1951(a); two counts of attempted robbery, in violation of 18 U.S.C. § 1985; one count of carrying a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c); and one count of possessing a firearm after conviction of a felony, in violation of 18 U.S.C. § 922(g).  Matthews promptly moved to suppress the evidence recovered from his backpack, arguing that (1) the evidence was derived from an investigatory stop that was illegal and thus constituted "fruit of the poisonous tree," and (2) even if the initial stop was lawful, the warrantless search of his backpack violated the Fourth Amendment because it did not fall under any of the established exceptions to the warrant requirement.

At the initial suppression hearing held on March 26, 2010, the Government argued that the search of Matthews' backpack was valid under the "search incident to arrest" exception.  After the Government presented its evidence, the District Court expressed skepticism that the search could be justified as a search incident to Matthews' arrest, as Matthews was secured in the police car at the time of the search.  Ultimately, the Court deferred ruling on the issue and allowed the parties to submit supplemental briefing.

In its supplemental briefing, the Government argued that the search of Matthews' backpack could be justified either as a search incident to arrest or as a valid "inventory search," or, in the alternative, that the contraband in the backpack would have been inevitably discovered when the backpack was inventoried at the police station.  In support

4

of its inventory search argument, the Government submitted evidence regarding the

Philadelphia Police Department's policy for searches prior to transporting an arrestee.

Philadelphia Police Department Memorandum 99-14 (hereinafter "Policy 99-14"

or the "policy") addresses the search of personal property seized pursuant to an arrest.

The policy reads as follows:

I.   BACKGROUND

    A.   In the case of U.S. v. Chadwick, the United States Supreme Court established guidelines regarding the search of luggage seized pursuant to an arrest.

II.  POLICY

    A.   The scope of a search incident to a lawful arrest is limited to the person arrested and the area within his/her immediate control.

    B.   The search of personal property immediately associated with the person of the defendant does not require a search warrant. (Example: Wallets, pocketbooks, etc.)

    C.   When an individual carrying a suitcase, briefcase, footlocker, etc. is arrested, the luggage may be seized. However, the contents of the luggage are generally not within the immediate control of the person arrested and therefore, the luggage can only be opened pursuant to the guidelines set forth below.

III. GUIDELINES

    A.   *When the arresting officer has probable cause to believe that a suitcase, briefcase, footlocker, etc. may contain contraband or fruits or instruments of the crime, the luggage shall be seized but NOT opened until a search warrant has been properly secured.*

    B.   In all cases in which exigent circumstances exist, an immediate search may be made at the time of the arrest.

5

However, the exigent circumstances must be clearly describable.

Examples of exigent circumstances:

- Immediately dangerous instrumentalities, e.g. explosives.

- Definite possibility that evidence may be destroyed (highly perishable evidence, e.g. blood).

C. *When the arresting officer has no reason to believe that the luggage contains contraband or evidence, the luggage shall be seized and held in police custody for safekeeping.*

1. A Property Receipt (75-3) will be issued for the luggage in accordance with the procedures outlined in Directive 91.

2. *The luggage will be opened and inventoried in the presence of the person from whom it was seized.*

3. The contents will be itemized on the Property Receipt.

App. 274-75 (italics added for emphasis, underlines and capitalization in original).

When the suppression hearing resumed on June 15, 2010, Officer Pomeroy was called to testify first. When asked why she opened Matthews' bag, Pomeroy testified that "before I put personal belongings in my car, I'm going to go through it. It's for safety, for my safety, my co-workers' and . . . the defendant himself." App. 297. She emphasized that this was not a search for contraband, but that she had "to make sure that bag is safe before [she] put it in [her] car." App. 298. She testified that she had conducted this type of search "every single time" that she had made an arrest in the field prior to transporting the arrestee, and that "it's how [officers were] trained to do it from the beginning in the academy." App. 298. Pomeroy noted that if the arresting officer did

6

not search an arrestee's property prior to transporting it to the police station, and the cell block attendant discovered "some kind of contraband, some kind of weapon [brought] into the cell block" when the arrestee was being booked, then the arresting officer "could actually be physically reprimanded." App. 302. On direct examination she was not asked about, and never mentioned, Policy 99-14.

On cross-examination, Matthews' counsel questioned Pomeroy about Policy 99-14 and its edict that an arresting officer must obtain a search warrant when he or she has probable cause to believe that a bag may contain contraband. Pomeroy testified that this requirement did not apply to the search of Matthews' backpack because she "had absolutely no reason to believe at that time that Mr. Matthews was involved in anything." App. 315. However, she also testified that she had never before obtained a search warrant before opening an arrestee's luggage or containers, nor knew of any other officers who did so under these circumstances.

Lieutenant Francis Healy, special legal counsel to the Philadelphia Police Commissioner, also testified regarding departmental policies. According to Healy, the purpose of Policy 99-14 is to outline the circumstances under which a police officer can legally conduct a search of an arrestee's bags. He testified that, according to the policy, if police officers do not have probable cause to believe a bag contains contraband, "they would just open it and inventory it in front of the defendant at that time, . . . catalogue the property, whatever it may be, and transport it along with the prisoner to the local [police station]." App. 322. The first purpose of such a search, he testified, is for officer safety and to ensure that hazardous materials are not permitted inside of a police facility. The

second purpose is to protect officers from allegations that an arrestee's personal property was stolen. Healy testified that Pomeroy's search of Matthews' backpack was consistent with departmental policy. He also stated that had Pomeroy not opened the bag on the street, the bag inevitably would have been searched at the police station when Matthews was processed.

In its briefing before the District Court, the Government emphasized that because Matthews was arrested "on a busy street in an urban setting[,] [t]he police were compelled to take his backpack with him upon his arrest at the intersection. They could not leave it in the street but had to transport it with the arrestee." App. 268.

## C.    The District Court Opinion

Soon after the suppression hearing, the District Court denied Matthews' motion to suppress. The Court held that the initial stop of Matthews was proper, as the officers had reasonable suspicion to believe that Matthews was involved in criminal activity based on the totality of the circumstances, and that the arrest was proper due to Matthews' outstanding warrants.[3] The District Court then considered whether the search of Matthews' backpack could be justified under any of the exceptions to the warrant requirement. The Court determined that the search could not be considered a valid search incident to Matthews' arrest, as to qualify as such the backpack would have had to have been in an area within Matthews' "immediate control" at the time of the search. Since Matthews was handcuffed and locked in the back of a police car at the time of the search,

---

[3] Matthews does not contest this ruling on appeal. *See* Matthews' Br. at 3-4.

it was clear that he "could not gain access to the contents of his backpack to harm the police officers or to destroy evidence." *United States v. Matthews*, Crim. A. No. 09-612, 2010 WL 2671388, at *5 (E.D. Pa. July 1, 2010). However, the Court concluded that the search qualified as a valid inventory search, finding that Officer Pomeroy searched the backpack "pursuant to long-standing and clearly articulated Philadelphia Police Department policy on the search and seizure of luggage." *Id.*, at *7. The Court found that because Matthews' arrest was based on warrants unrelated to the alleged attempted robbery, there was no probable cause to search his backpack. Thus, it found that the search fell under Section III.C of Policy 99-14 and did not require a search warrant. *Id.* In a footnote, the District Court observed that, even if the search was not a valid inventory search at the scene of the arrest, the contents of the bag were admissible because they "inevitably would have been discovered when the bag was inventoried at the police station." *Id.*, at *7 n.6.

Matthews was convicted by jury of conspiracy, attempted robbery, carrying a firearm during and in relation to a crime of violence, and possessing a firearm after conviction of a felony, and was sentenced to 192 months' imprisonment. He has filed an appeal challenging his judgment of conviction and sentence.

## II. DISCUSSION[4]

---

[4] We have jurisdiction over this appeal pursuant to 28 U.S.C. § 1291. The District Court had jurisdiction over the case pursuant to 18 U.S.C. § 3231. We review "the District Court's denial of a motion to suppress for clear error as to the underlying factual findings and exercise[] plenary review of the District Court's application of the law to those facts." *United States v. Perez*, 280 F.3d 318, 336 (3d Cir. 2002).

9

The Fourth Amendment affords protections against "unreasonable searches and seizures" of a person's "effects." U.S. Const. amend IV. "[O]ur analysis begins . . . with the basic rule that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment.'" *Arizona v. Gant*, 556 U.S. 332, 338 (2009) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)). "Nevertheless, because the ultimate touchstone of the Fourth Amendment is 'reasonableness,' the warrant requirement is subject to certain exceptions." *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006). Such exceptions have been created where courts have found that "the exigencies of the situation make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment." *Mincey v. Arizona*, 437 U.S. 385, 394 (1978) (internal quotation marks omitted). The potentially applicable exceptions are addressed below.

## A. The Search Incident to Arrest Exception

"Among the exceptions to the warrant requirement is a search incident to a lawful arrest. The exception derives from interests in officer safety and evidence preservation that are typically implicated in arrest situations." *Gant*, 556 U.S. at 338 (internal citations omitted). "[P]olice may search incident to arrest only the space within an arrestee's 'immediate control,' meaning 'the area from within which he might gain possession of a weapon or destructible evidence.'" *Id.* at 335 (quoting *Chimel v. California*, 395 U.S. 752, 763 (1960)). However, "[o]nce law enforcement officers have [exclusive control over] luggage or other personal property not immediately associated with the person of the arrestee . . . , and there is no longer any danger that the arrestee might gain access to

10

the property to seize a weapon or destroy evidence, a search of that property is no longer an incident of the arrest." *United States v. Chadwick*, 433 U.S. 1, 15 (1977) *abrogated on other grounds by California v. Acevedo*, 500 U.S. 565 (1991).

In *United States v. Shakir*, 616 F.3d 315 (3d Cir. 2010), we held that as long as there is "a reasonable possibility" that an arrestee could destroy evidence or gain access to a weapon in the container or area being searched, the search is permissible. *Id.* at 321. Although this standard is a "lenient" one, it "requires something more than the mere theoretical possibility that a suspect might access a weapon or evidence." *Id.* "In determining whether an object is conceivably accessible to the arrestee, we are to assume that he was neither an acrobat nor Houdini." *United States v. Myers*, 308 F.3d 251, 267 (3d Cir. 2002) (internal quotation marks and alteration omitted). Here, there was no reasonable possibility that Matthews could have accessed the backpack at the time Officer Pomeroy executed the search, as he was handcuffed in the back of a locked police car. Thus, the District Court was correct in concluding that the search could not be justified under the search incident to arrest exception.

## B.     The Inventory Search Exception

The Supreme Court first addressed the constitutionality of inventory searches in *South Dakota v. Opperman*, 428 U.S. 364 (1976), where it concluded that warrantless searches of automobiles impounded or otherwise lawfully in police custody are reasonable under the Fourth Amendment when they are conducted "pursuant to standard police procedures." *Id.* at 372. Inventory searches are justified by "three distinct needs: the protection of the owner's property while it remains in police custody; the protection

11

[of] the police against claims or disputes over lost or stolen property; and the protection of the police from potential danger." *Id.* at 369 (internal citations omitted).

In *Illinois v. Lafayette*, 462 U.S. 640 (1983), the Court extended the inventory search exception to cover stationhouse searches of an arrestee's personal effects, holding that "it is not 'unreasonable' for police, as part of the routine procedure incident to incarcerating an arrested person, to search any container or article in his possession, in accordance with established inventory procedures." *Id.* at 648. In reaching this conclusion, the Court distinguished between the reasonableness of searches at the stationhouse prior to being placed in confinement and the searches at the time and place of an arrest, finding that "[p]olice conduct that would be impractical or unreasonable—or embarrassingly intrusive—on the street can more readily—and privately—be performed at the station." *Id.* at 645.

In *Florida v. Wells*, 495 U.S. 1 (1990), the Court discussed what degree of regulations are necessary to ensure that the "standardized criteria" for an inventory search satisfy the Fourth Amendment. *Id.* at 4. The Court held that an inventory policy must not allow so much latitude to police officers that the inventory search could be turned into a "purposeful and general means of discovering evidence of crime." *Id.* (internal quotation marks omitted). However, the Court acknowledged that such searches need not "be conducted in a totally mechanical 'all or nothing' fashion," and that "[a] police officer may be allowed sufficient latitude to determine whether a particular container should or should not be opened in light of the nature of the search and characteristics of the container itself." *Id.*

12

Following *Wells*, our precedent has established that in order for criteria regulating inventory searches to be sufficiently "standardized" under the Fourth Amendment, "[t]he criteria or routine must limit an officer's discretion in two ways: first, as to *whether* to search . . . , and second, as to the *scope* of [the] search." *United States v. Mundy*, 621 F.3d 283, 288 (3d Cir. 2010) (emphasis in original). In *Mundy*, we considered a policy regarding the search of an impounded vehicle that directed police officers to "conduct[] a vehicle inventory describing any . . . personal property of value left in the vehicle" and limited the scope of the search by stating that "[n]o locked areas, including the trunk area, will be forced open while conducting an inventory." *Id.* at 290. We held that the policy "provided sufficiently standardized criteria regulating the scope of a permissible inventory search—including searches of closed containers." *Id.* at 293.

*Mundy* also addressed what level of compliance with a departmental policy is necessary to ensure that the warrantless search satisfies the inventory search exception. While the officers in *Mundy* "produced an inventory of items seized from the vehicle on property receipts, including the narcotics," they failed to "complete a Towing Report describing personal effects left in the vehicle," which was required by the policy. *Id*. However, we held that lack of perfect compliance did not render the search unreasonable, stating that "[a]lthough compliance with procedures 'tends to ensure the intrusion is limited to carrying out the government's caretaking function,' failure to follow through with standard procedures does not necessarily render the search unreasonable." *Id.* (quoting *United States v. Mayfield*, 161 F.3d 1143, 1145 (8th Cir. 1998)). Because "[t]he

search . . . was undertaken pursuant to established procedures and standardized criteria designed to produce an inventory," we found it to be reasonable. *Id.* at 294.

Here, the District Court determined that Officer Pomeroy's search of Matthews' backpack was a valid inventory search, conducted pursuant to well-established police procedures. However, Matthews contends that to the extent there was a standardized procedure in place, it was not followed in this case.

"'The existence of . . . a valid [standardized inventory search] procedure may be proven by reference to either written rules and regulations or testimony regarding standard practices.'" *Id.* at 290 n.5 (quoting *United States v. Thompson*, 29 F.3d 62, 65 (2d Cir. 1994)) (alteration in original). Philadelphia Police Department Policy 99-14 was identified by the Government as the relevant procedure in this case. The policy purports to "establish[] guidelines regarding the search of luggage seized pursuant to an arrest." App. 274. Under Section III.A of the policy:

> When the arresting officer has *probable cause to believe* that a suitcase, briefcase, footlocker, etc. may contain contraband or fruits or instruments of the crime, the luggage shall be seized but NOT opened until a search warrant has been properly secured.

App. 274 (emphasis added, capitalization in original). However, under Section III.C of the policy:

> When the arresting officer has *no reason to believe* that the luggage contains contraband or evidence, . . . [t]he luggage will be opened and inventoried in the presence of the person from whom it was seized.

App. 275 (emphasis added).

14

As we pointed out at oral argument, this creates a "reverse Catch-22": If a police officer has probable cause to believe that an arrestee's luggage contains contraband, he must get a warrant prior to searching it, pursuant to Section III.A. Tr. of Jan. 8, 2013 Oral Arg. at 18. However, if a magistrate determines that the officer lacks probable cause and denies the warrant application, the officer may then immediately open the luggage and search it pursuant to Section III.C.[5] Thus, Policy 99-14 fails to place any limitations whatsoever on the scope of the officer's discretion in conducting such a search, as the only purported limitation—that officers must obtain a search warrant if they have probable cause to believe the luggage contains contraband—is illusory.

At oral argument the Government conceded that Policy 99-14 imposes "a superfluous requirement of probable cause that conflicts with Supreme Court . . . decisions on point [that say that] probable cause is irrelevant." *Id.* at 20. Still, the

---

[5] The following colloquy took place at oral argument:

> THE COURT: [L]et's assume the police officer, believing that there was probable cause, that the bag contained contraband, similar to what your opponent is arguing, and he went and he attempted to get a search warrant for the bag. But for some reason the magistrate denies the warrant, denies the application on the ground that there was no probable cause. Could the officer then conduct an inventory search?
>
> GOVERNMENT: I think the officer would be required to conduct an inventory search.
>
> THE COURT: What is the point of that first requirement then? . . . [I]t just seems that there's absolutely no point to the probable cause requirement because *I can always open the bag* before I take the individual—
>
> GOVERNMENT: Exactly, your Honor.

Tr. of Jan. 8, 2013 Oral Arg. at 17-18 (emphasis added).

Government urges us to uphold the search of Matthews' backpack as an inventory search "because it was conducted pursuant to a standard practice," *id.* at 29, and "all that's needed to pass constitutional muster is a standardized procedure that is designed to produce an inventory that doesn't allow the officers latitude to search indiscriminately for evidence," *id.* at 19-20. The Government is correct in its assessment of the law. As we recognized in *Mundy*, "'the Supreme Court has not required an absence of expectation of finding criminal evidence as a prerequisite to a lawful inventory search.'" 621 F.3d at 294 (quoting *United States v. Lopez*, 547 F.3d 364, 372 (2d Cir. 2008)). Indeed, as long as the search "is performed under standardized procedures for legitimate custodial purposes," the officer's expectations are irrelevant. *Id.* (quoting *Lopez*, 547 F.3d at 372).

Still, assuming without deciding that Policy 99-14 constitutes a valid standardized procedure to govern searches of arrestees' personal belongings, the question remains as to whether Officer Pomeroy's search of Matthews' backpack was conducted in accordance with the policy. The record indicates that it was not. During the June 2010 suppression hearing, Pomeroy made clear that she always searches arrestees' personal belongings without a warrant. Viewing these warrantless searches to be justified in all circumstances by safety concerns, Pomeroy testified that she searches an arrestee's personal belongings "every single time" she makes an arrest and had never previously sought a warrant for such a search. App. 297-98. This testimony cannot be reconciled with Section III.A of Policy 99-14, which requires officers who have probable cause to believe that an arrestee's luggage may contain contraband to seize it, "but NOT open[] [it] until a search warrant has been properly secured." Nor can Pomeroy's search be

16

reconciled with Section III.C.2 of the policy, which states that "[w]hen the arresting officer has no reason to believe that [seized] luggage contains contraband or evidence . . . [t]he luggage will be opened and inventoried in the presence of the person from who it was seized." App. 275. While Pomeroy testified that she opened Matthews' backpack next to the police vehicle in which he was detained, she did not inventory the items at that time; instead, Officer Frisco was left to type up an inventory receipt sometime later when he returned to the police station. Thus, we conclude that Officer Pomeroy's warrantless search of Matthews' backpack was not conducted "pursuant to established procedures and standardized criteria designed to produce an inventory," and cannot be justified under the inventory search exception to the warrant requirement.[6] *Mundy*, 621 F.3d at 294.

While the District Court erred in its inventory search analysis, "[w]e may affirm a district court for any reason supported by the record." *Cardona v. Bledsoe*, 681 F.3d 533, 535 n.4 (3d Cir. 2012). Accordingly, we will proceed to discuss an alternative rationale for the search.

## C.     Search Pursuant to the Transportation of an Arrestee

In *United States v. Chadwick*, federal narcotics agents had probable cause to believe that a 200-pound double-locked footlocker contained marijuana. The agents tracked the locker as the defendants removed it from a train and carried it through the

---

[6] Accordingly, we need not decide if an "inventory search" conducted outside of the stationhouse comports with the Fourth Amendment, even if governed by standardized procedures. As the Supreme Court recognized in *Lafayette*, "the factors justifying a search of the person and personal effects of an arrestee upon reaching a police station but prior to being placed in confinement are somewhat different from the factors justifying an immediate search at the time and place of arrest." 462 U.S. at 645.

17

station to a waiting car. Moments after the defendants lifted the locker into the trunk of the car the agents arrested them and seized the locker. The defendants were transported to a federal building along with the locker, which was eventually searched and found to contain large amounts of marijuana. In an opinion by Chief Justice Burger, the Supreme Court concluded that the warrantless search of the locker was unconstitutional, holding that if police have probable cause to believe that an arrestee's "luggage or other property seized at the time of an arrest" contains contraband or evidence of a crime, the warrantless search of such property violates the Fourth Amendment. *Chadwick*, 433 U.S. at 15. The Court reasoned that "[u]nlike searches of the person, searches of possessions within an arrestee's immediate control cannot be justified by any reduced expectations of privacy caused by the arrest." *Id.* at 16 n.10 (internal citations omitted). The Court did note however:

> there may be other justifications for a warrantless search of luggage taken from a suspect at the time of his arrest; for example, if officers have reason to believe that luggage contains some immediately dangerous instrumentality, such as explosives, it would be foolhardy to transport it to the station house without opening the luggage and disarming the weapon.

*Id.* at 15 n.9. Furthermore, the Court contrasted the warrantless search of luggage which officers had probable cause to believe contained contraband with "noncriminal inventory searches, where probable cause to search is irrelevant" and "the salutary functions of a warrant simply have no application." *Id.* at 10 n.5.

Justice Blackmun, writing in dissent, advocated the adoption of "a clearcut rule permitting property seized in conjunction with a valid arrest in a public place to be searched without a warrant." *Id.* at 21 (Blackmun, J. dissenting). As he explained:

18

> A person arrested in a public place is likely to have various kinds of property with him: items inside his clothing, a briefcase or suitcase, packages, or a vehicle. In such instances the police cannot very well leave the property on the sidewalk or street while they go to get a warrant. The items may be stolen by a passer-by or removed by the suspect's confederates. Rather than requiring the police to "post a guard" over such property, I think it is surely reasonable for the police to take the items along to the station with the arrested person.

*Id.* at 19. He continued: "I believe this sort of practical evaluation underlies the Court's decision permitting clothing, personal effects, and automobiles to be searched without a warrant as an incident of arrest, even though it would be possible simply to impound these items until a warrant could be obtained." *Id.* at 20. "Such an approach would simplify the constitutional law of criminal procedure without seriously derogating from the values protected by the Fourth Amendment's prohibition of unreasonable searches and seizures." *Id.* at 22.

For Justice Blackmun, giving police officers the Hobson's choice between (a) leaving an arrestee's property on a public street or (b) transporting it to the police station without checking its contents, made little sense. In the years since *Chadwick* was decided, other members of the Supreme Court have recognized the impracticality of this rule. In his concurring opinion in *Acevedo*, Justice Scalia pointed out:

> Under our precedents (as at common law), a person may be arrested outside the home on the basis of probable cause, without an arrest warrant. Upon arrest, the person, as well as the area within his grasp, may be searched for evidence related to the crime. Under these principles, if a known drug dealer is carrying a briefcase reasonably believed to contain marijuana (the unauthorized possession of which is a crime), the police may arrest him and search his person on the basis of probable cause alone. And, under our precedents, upon arrival at the station house, the police may inventory his possessions, including the briefcase, even if there is no reason to suspect that they contain contraband. According to our current law, however, the

> police may not, on the basis of the same probable cause, take the less intrusive step of stopping the individual on the street and demanding to see the contents of his briefcase. That makes no sense *a priori,* and . . . I see no reason to continue it.

*Acevedo*, 500 U.S. at 584 (Scalia, J. concurring) (internal citations omitted). Echoing the sentiments of Justice Blackmun's *Chadwick* dissent, Justice Scalia urged a "path out of this confusion" by returning to the Fourth Amendment's "reasonableness" requirement. *Id.* at 583.

We agree. "As the text of the Fourth Amendment indicates, the ultimate measure of the constitutionality of a governmental search is 'reasonableness.'" *Maryland v. King*, 133 S. Ct. 1958, 1969 (2013) (quoting *Vernonia School Dist. 47J v. Acton,* 515 U.S. 646, 652 (1995)). "In some circumstances, such as '[w]hen faced with special law enforcement needs, diminished expectations of privacy, minimal intrusions, or the like, the Court has found that certain general, or individual, circumstances may render a warrantless search or seizure reasonable.'" *Id.* at 1969 (quoting *Illinois v. McArthur,* 531 U.S. 326, 330 (2001)). Still, "[u]rgent government interests are not a license for indiscriminate police behavior." *Id.* at 1970. Thus, to determine whether the warrantless search of Matthews' backpack was reasonable "we must balance its intrusion on [his] Fourth Amendment interests against its promotion of legitimate government interests." *Lafayette*, 462 U.S. at 644 (1983) (internal quotation marks omitted).

As an initial matter, we question whether Matthews had a reasonable expectation of privacy in his backpack at the time of his arrest. "[W]hat is reasonable [under the Fourth Amendment] depends on the context within which a search takes place. The

legitimacy of certain privacy expectations vis-á-vis the State may depend upon the individual's legal relationship with the State." *King*, 133 S. Ct. at 1978 (internal quotation marks and citations omitted). While "[e]very citizen clearly has an interest in the privacy of the contents of his or her luggage, briefcase, handbag or any other container that conceals private papers and effects from public scrutiny," *Acevedo*, 500 U.S. at 598 (Stevens, J. dissenting), the Supreme Court has repeatedly held that "[t]he expectations of privacy of an individual taken into police custody 'necessarily [are] of a diminished scope,'" *King*, 133 S. Ct. at 1978 (quoting *Bell v. Wolfish*, 441 U.S. 520, 557 (1979)). Matthews, who had two warrants out for his arrest and had been taken into police custody, could not reasonably expect the contents of his backpack to remain private.

In *Maryland v. King*, the Supreme Court held that "the need for law enforcement officers in a safe and accurate way to process and identify the persons and possessions that they must take into custody" outweighed an arrested person's privacy interest in his own DNA. *Id.* at 1970, 1980. The reasoning of *King* applies in this case. Public safety officials need "safe and accurate" means to transport "persons and possessions" that they have taken into custody. And certainly if the government's interest in correctly identifying a person taken into custody outweighs that person's expectation of privacy in his or her own DNA, the government's interest in ensuring officer safety while transporting an arrested person's luggage outweighs that person's expectation of privacy in such luggage (which would be subject to a search as soon as the person arrived at the

21

cell block, in any event).  Accordingly, we find that Officer Pomeroy's search of Matthews' backpack was reasonable under the Fourth Amendment.

We recognize that this search does not fall neatly into any of the existing "well-delineated exceptions" to the warrant requirement.  However, such exceptions "have been established where it was concluded that the public interest required some flexibility in the application of the general rule that a valid warrant is a prerequisite for a search" and "where the societal costs of obtaining a warrant, such as danger to law officers . . . , outweigh the reasons for prior recourse to a neutral magistrate."  *Arkansas v. Sanders*, 442 U.S. 753, 759 (1979) *abrogated on other grounds by Acevedo*, 500 U.S. 565.  Moreover, "[t]he need for a warrant is perhaps least when the search involves no discretion that could properly be limited by the 'interpo[lation of] a neutral magistrate between the citizen and the law enforcement officer.'"  *King*, 133 S. Ct. at 1969 (quoting *Treasury Employees v. Von Raab*, 489 U.S. 656, 667 (1989)).  We find such circumstances to be present here.

In our view, when a valid arrest has been made in a public place, which requires that the arrested person be transported from the scene, police may search any luggage that the person has in his possession at the time of the arrest, and which must accompany him to the police station, prior to transporting it.  As with the inventory search exception, searches of this type are justified by concerns for officer safety and will be valid whether or not an officer has probable cause to believe the evidence contains contraband.  *See Lafayette*, 462 U.S. at 646 ("It is immaterial whether the police actually fear any particular package or container; the need to protect against [safety] risks arises

22

independent of a particular officer's subjective concerns."); *Brigham City*, 547 U.S. at 403 ("The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency." (internal quotation marks omitted)).

We recognize that "the reach of each exception [must be limited] to that which is necessary to accommodate the identified needs of society." *Sanders*, 442 U.S. at 760. Accordingly, our holding is narrowly tailored to accommodate the eminently important goal of ensuring police officer safety; it applies only to the luggage of individuals arrested in public that must be transported along with the arrestee to a police facility. While "[a]n arrested person is not invariably taken to a police station or confined," *Lafayette*, 462 U.S. at 645, "[i]t is scarcely open to doubt that the danger to an officer is far greater in the case of the extended exposure which follows the taking of a suspect into custody and transporting him to the police station," *United States v. Robinson*, 414 U.S. 218, 234-35 (1973). "Dangerous instrumentalities—such as razor blades, bombs, or weapons—can be concealed in innocent-looking articles taken from the arrestee's possession. The bare recital of these mundane realities justifies reasonable measures by police to limit these risks." *Lafayette*, 462 U.S. at 656. Simply put, "[l]aw enforcement officers should not be precluded from conducting a[] . . . search when they take a potential 'Trojan horse' into their [possession]." *Chadwick*, 433 U.S. at 21 (Blackmun, J. dissenting).

Finally, we acknowledge that "the central concern underlying the Fourth Amendment [is] the concern about giving police officers unbridled discretion to

23

rummage at will among a person's private effects." *Gant*, 556 U.S. at 345. Our holding today does not open these floodgates. We sanction only those searches of personal property that occur after a suspect has been *validly* arrested, where the property itself must invariably be transported along with the arrestee to the police station.[7] Because "the suspect's expectations of privacy are properly abated by the fact of arrest itself," *Chadwick*, 433 U.S. at 21 (Blackmun, J. dissenting), we find that such an approach is reasonable.

## D. Inevitable Discovery

We note that, even if we were to find the search of Matthews' backpack unconstitutional, we agree with the District Court that the evidence in question would have been discovered pursuant to a valid inventory search at the police station when Matthews was processed, and thus it was properly admitted under the inevitable discovery doctrine. *See Matthews*, 2010 WL 2671388, at *7 n.6; *Nix v. Williams*, 467 U.S. 431, 448 (1984) (Holding that evidence will not be suppressed even if there is a

---

[7] Ultimately, we expect this holding will have little practical effect, as police officers already engage in this practice, and searches such as these have been upheld under other exceptions to the warrant requirement or the inevitable discovery doctrine. *See Chadwick*, 433 U.S. at 21 (Blackmun, J. dissenting) ("It is also possible that today's decision will not have much impact because other doctrines often will be available to sustain warrantless searches of objects in police custody. As the Court acknowledges, no warrant is necessary when the authorities suspect the object they have impounded has dangerous contents. Moreover, police may establish a routine procedure of inventorying the contents of any container taken into custody, for reasons of security and property conservation. . . . Finally, exigent circumstances may often justify an immediate search of property seized in conjunction with an arrest, in order to facilitate the apprehension of confederates or the termination of continuing criminal activity." (internal citations omitted)).

24

constitutional violation if we find that the evidence would inevitably have been discovered even if no violation of any constitutional or statutory provision had taken place).

### III. CONCLUSION

"[T]he protection of the Fourth and Fourteenth Amendments can only be realized if the police are acting under a set of rules which, in most instances, makes it possible to reach a correct determination beforehand as to whether an invasion of privacy is justified in the interest of law enforcement." *New York v. Belton*, 453 U.S. 454, 458 (1981) (internal quotation marks omitted).

> A highly sophisticated set of rules, qualified by all sorts of ifs, ands, and buts and requiring the drawing of subtle nuances and hairline distinctions, may be the sort of heady stuff upon which the facile minds of lawyers and judges eagerly feed, but they may be literally impossible of application by the officer in the field.

*Chadwick*, 433 U.S. at 22 n.3 (Blackmun, J. dissenting) (internal quotation marks omitted). Thus, "[a] single, familiar standard is essential to guide police officers, who have only limited time and expertise to reflect on and balance the social and individual interests involved in the specific circumstances they confront." *Belton*, 453 U.S. at 458 (quoting *Dunaway v. New York*, 442 U.S. 200, 213-14 (1979)). We believe that we have fashioned such a standard with our holding today. Thus, we hold that when a valid arrest has been made in a public place, which requires that the arrested person be transported from the scene, police may search any luggage that the person has in his possession at the time of the arrest, and which must accompany him to the police station, prior to transporting it. Such a search is "reasonable" in a twenty-first century where threats to

25

the safety of police officers include backpacks that conceal bombs, capable of extreme devastation, which can be triggered remotely. To hold that officers could not search such containers prior to placing them in their police vehicles would be to make the "criminal law a trap for the unwary policeman and detract from the important activities of detecting criminal activity and protecting the public safety." *Chadwick*, 433 U.S. at 22 (Blackmun, J. dissenting).

For the foregoing reasons, we will affirm the Judgment of the District Court.[8]

---

[8] As Matthews acknowledges, his argument regarding the constitutionality of the felon-in-possession statute is foreclosed by *United States v. Singletary*, 268 F.3d 196 (3d Cir. 2001). See Matthews' Br. at 47 ("While Mr. Matthews acknowledges the binding effect of *Singletary* in this Court, he preserves the issue of § 922(g)(1)'s constitutionality for review by the Supreme Court or in any future proceedings in this case or a collateral action."). Thus we will not address his arguments here.

**AMBRO**, <u>Circuit Judge</u>, concurring in part and concurring in the judgment

I concur in the judgment because I agree with my colleagues and the District Court that the evidence discovered in Matthews's bag was admissible under the inevitable discovery doctrine. Maj. Op. at 23–24; *see also United States v. Mendez*, 315 F.3d 132 (2d Cir. 2002). I also agree that the inventory procedure established in Philadelphia Police Department Memorandum 99-14 ("Policy 99-14") is a "heads I win, tails you lose" arrangement that will always result in Matthews's bag being searched. Nonetheless, I write separately to express my concern that the warrant exception my colleagues craft, if it had been precedential, would allow law enforcement officers to skirt the requirement that inventory searches be conducted in line with standardized criteria or an established routine. *See Florida v. Wells*, 495 U.S. 1, 4 (1990).

To satisfy constitutional requirements, inventory searches must be administrative, not investigatory, in nature. We allow police officers to catalogue the items in an arrestee's possession when he is taken into custody to promote a number of governmental interests. *Colorado v. Bertine*, 479 U.S. 367, 372 (1987). "[I]nventory procedures serve to protect an owner's property while it is in the custody of the police, to insure against claims of lost, stolen, or vandalized property, and to guard the police from danger." *Id.* We do not permit them so that law enforcement can further its investigatory objectives under the guise of producing an inventory of impounded items. *Wells*, 495 U.S. at 4.

Policy 99-14 is presumably designed to guard against police officers conducting inventories with investigatory intent by allowing them to perform a warrantless inventory

only when they do not believe the luggage contains contraband. As my colleagues aptly explain, this procedure could be accused of elevating form over substance. Matthews's backpack was going to be searched; the only question was the path the arresting officers were required to take to do so. If they thought there was probable cause to believe his backpack contained contraband, the policy directed them to obtain a search warrant. If they thought probable cause did not exist, or the magistrate denied their warrant application on the ground that there was no probable cause, the policy directed them to conduct an inventory search.

Though my colleagues and I agree that Officer Pomeroy did not follow this policy when she searched Matthews's backpack, we disagree as to the importance of requiring law enforcement agencies to follow standardized procedures when conducting non-investigatory searches. As the majority sees it, "when a valid arrest has been made in a public place, which requires that the arrestee be transported from the scene, police may search any luggage that the arrestee has in his possession at the time of the arrest, and which must accompany the arrestee to the station, prior to transporting it."[1] Maj. Op. at 22. By creating this new exception, they authorize police to conduct inventory searches that do not follow standardized procedure or routine. This is both contrary to precedent

[1] The majority's careful caveat that the luggage must need to be accompanied to the station in order to justify the search invites the "next case" question of what happens if someone is arrested with another person who is not arrested (say the arrestee's mother or girlfriend). No probable cause exists to seek a warrant to search the arrestee's bag, and the accompanying person is willing to take the bag. There is no probable cause, no safety concern, and no need for an inventory at the station. If the non-arrested person is not permitted to take the luggage, is not any search of it solely for investigatory purposes?

2

and, in my view, a slippery slope. It also makes irrelevant the other established exceptions—search-incident-to-arrest, *see, e.g.*, *United States v. Shakir*, 616 F.3d 315, 321 (3d Cir. 2010), and exigent circumstances, *see, e.g.*, *United States v. Kreimes*, 649 F.2d 1185, 1190–91 (5th Cir. 1981)—that may justify a warrantless search of the luggage of an arrestee in custody.

My colleagues suggest that they are not authorizing an inventory search, but a search pursuant to the transportation of an arrestee. I see little difference between the two "types" of searches. Both are administrative, not investigatory, in nature. And both are intended, in part, to secure officer safety. I neither doubt the importance of this objective nor disagree that an arrestee's privacy must at times give way to it. My disagreement is with whether we should require police to follow established criteria when conducting these sorts of administrative searches. If police leadership thinks safety concerns justify the need to search an arrestee's bags prior to his transportation to the stationhouse, requiring it to implement an established procedure to regulate those searches is a minimal burden that I see no reason to discard.[2]

The Supreme Court has held that "reasonable police regulations relating to inventory procedures administered in good faith satisfy the Fourth Amendment." *Bertine*, 479 U.S. at 374; *see also Illinois v. Lafayette*, 462 U.S. 640, 648 (1983). It has always

---

[2] The majority notes that it "need not decide if an 'inventory search' conducted outside of the stationhouse comports with the Fourth Amendment, even if governed by standardized procedures." Maj. Op. at 17 n.6. Other Courts of Appeals have approved inventory searches conducted at the site of arrest, as opposed to at the stationhouse, provided they are performed according to established criteria. *See, e.g.*, *United States v. McKinnon*, 681 F.3d 203, 206 (5th Cir. 2012), *cert. denied*, 133 S. Ct. 980 (2013).

"adhered to the requirement," however, "that inventories be conducted according to standardized criteria." *Bertine*, 479 U.S. at 375 n. 6. This requirement "tend[s] to ensure that the intrusion w[ill] be limited in scope to the extent necessary to carry out the caretaking function." *South Dakota v. Opperman*, 428 U.S. 364, 375 (1976). And it does not become "a ruse for a general rummaging in order to discover incriminating evidence." *Wells*, 495 U.S. at 4. Indeed, in *Maryland v. King*, 133 S.Ct. 1958 (2013), a case relied on heavily by the majority for the proposition that an arrestee's privacy interests are outweighed by the need to protect officer safety, the administrative DNA search the Supreme Court upheld as constitutional was conducted in accordance with detailed procedural requirements established by the Maryland DNA Collection Act. *Id.* at 1967, 1979–80; *see also id.* at 1983–86 (Scalia, J., dissenting) (based in part on the view that the DNA-collection procedures revealed that the searches had an investigatory, not an administrative, intent).

We have previously addressed the role of standardized procedures when vehicles are impounded and searched by police. *United States v. Mundy*, 621 F.3d 283 (3d Cir. 2010); *United States v. Salmon*, 944 F.2d 1106 (3d Cir. 1991). Following the Supreme Court's ruling that inventory procedures may lawfully provide officers with discretion in conducting the search "so long as that discretion is exercised according to standard criteria and on the basis of something other than suspicion of evidence of criminal activity," *Bertine*, 479 U.S. at 375, we have permitted inventories conducted pursuant to criteria that limit officer discretion in two ways. "First, it must limit the officer's discretion regarding *whether* to search a seized vehicle. Second, the pre-existing criteria

4

or routine must limit an officer's discretion regarding the *scope* of an inventory search, particularly with respect to the treatment of closed containers." *Salmon*, 944 F.2d at 1120 (emphases in original). "These limitations," as we have explained, make certain "that officers performing these caretaking functions are 'not allowed so much latitude that inventory searches are turned into a purposeful and general means of discovering evidence of a crime.'" *Mundy*, 621 F.3d at 288 (quoting *Wells*, 495 U.S. at 4).

The need to circumscribe officer discretion is equally applicable in the context of luggage searches. *See Lafayette*, 462 U.S. at 648 ("[W]e hold that it is not 'unreasonable' for police, as part of the routine procedure incident to incarcerating an arrested person, to search any container or article in his possession, in accordance with established inventory procedures."). When they seize a bag "'in circumstances that suggest a probability of discovering criminal evidence, the officers will inevitably be motivated in part by criminal investigative objectives.'" *Mundy*, 621 F.3d at 294 (quoting *United States v. Lopez*, 574 F.3d 364, 372 (2d Cir. 2008)). The use of standardized procedures helps to prevent these investigatory objectives from driving the occurrence and nature of the search.

Though my colleagues wisely limit their holding to the search of luggage impounded when an arrestee is taken into custody, there may be no principled way to prevent this exception from creeping into other contexts. "It remains a 'cardinal principle that searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.'" *California v. Acevedo*, 500

5

U.S. 565, 580 (1991) (quoting *Mincey v. Arizona*, 437 U.S. 385, 390 (1978)) (emphasis in original).  By creating a new exception, we run the risk of inverting this presumption.

Admittedly, Policy 99-14 is so broad that it can result in officers universally searching the luggage of arrestees taken into custody, the same result that may be produced by my colleagues' new exception to obtaining a warrant.  But this does not mean that insisting on the use of standardized procedures is purposeless.  Conducting such searches per predetermined criteria ensures that officers are uniformly searching luggage in this manner and not singling out some arrestees on the basis of an investigatory suspicion that falls short of probable cause.  In addition, though we do not pass on the permissibility of the Policy 99-14, there may be instances where we determine that police regulations are unreasonable in light of the administrative interests these searches are intended to serve.

For these reasons, I do not endorse my colleagues' rule that officers transporting an arrestee from a public arrest site may conduct a warrantless search of any luggage in the arrestee's possession without following standardized procedures.