******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* VICTOR JORDAN, SR.
(SC 19135)

Rogers, C. J., and Palmer, Zarella, Eveleigh, McDonald, Espinosa and Robinson, Js.

*Argued April 21—officially released October 14, 2014*

*Pamela S. Nagy*, assigned counsel, for the appellant (defendant).

*Robin S. Schwartz*, special deputy assistant state's attorney, with whom, on the brief, were *Maureen Platt*, state's attorney, and *Terence Mariani*, senior assistant state's attorney, for the appellee (state).

*Opinion*

McDONALD, J. The defendant, Victor Jordan, Sr., was convicted, after a jury trial, of possession of an amphetamine-type substance with intent to sell by a person who is not drug-dependent in violation of General Statutes § 21a-278 (b), and possession of an amphetamine-type substance with intent to sell within 1500 feet of a school in violation of General Statutes § 21a-278a (b), on the basis of evidence seized from his person and a closet in which he had been hiding pursuant to a search incident to his arrest.[1] On appeal,[2] the defendant contends that: (1) the trial court improperly denied his motion to suppress drugs seized from the closet because the closet was not within his immediate control; (2) the evidence was insufficient to support either conviction because it did not establish his knowledge and intent; and (3) he is entitled to a new trial due to improper comments made during the prosecutor's closing argument. We conclude that, even if we were to assume that the trial court improperly denied the motion to suppress, any error would be harmless beyond a reasonable doubt in light of the validly seized evidence from the defendant's person. Although we also conclude that this evidence, in and of itself, is sufficient to sustain the defendant's conviction for possession with intent to sell, we agree that the evidence is insufficient to demonstrate the defendant's intent to sell within a school zone. Finally, we are not persuaded that any prosecutorial impropriety requires a new trial. Therefore, we affirm in part and reverse in part the judgment.

The jury reasonably could have found the following facts. On April 16, 2008, at approximately 7:40 a.m., officers assigned to a multijurisdictional fugitive task force arrived at 555 Congress Avenue in Waterbury looking for the defendant with the intent to arrest him on multiple outstanding felony warrants. That address is within 1500 feet of a public elementary school. The task force included Lieutenant Patrick Deely of the Middlebury Police Department, Sergeant Michael Ponzillo and Detective Orlando Rivera of the Waterbury Police Department, and Sergeant Gerald Pinto of the Stratford Police Department.

When they arrived, the officers approached the rear, first floor apartment door of the two-family home and entered an enclosed porch. The door to the apartment was open and they began shouting "police" to announce their presence. They were then met by the homeowner, Richard Colangelo, Sr., to whom the officers showed a photograph of the defendant. Colangelo acknowledged that the defendant was in the home and directed them through the kitchen to a small back bedroom. When the officers entered the bedroom, they saw a younger man in the room, who they later learned was the homeowner's son, Richard Colangelo, Jr. (Richard). After

police asked Richard if the defendant was present, he pointed toward the bedroom closet. The officers asked Richard to leave the room and then drew their weapons, shouting for the defendant to come out of the closet with his hands up. When the defendant did not comply, Pinto and Rivera entered the closet to extricate him. After a brief struggle, the two officers pulled the defendant out of the closet into the main area of the bedroom, at which time the other officers held him facedown on the floor and handcuffed him, with his hands behind his back. This process, from the time the officers entered the bedroom to the time they subdued the defendant on the floor, took one minute or less.

Once the defendant was removed from the closet, Ponzillo searched him and found a small, clear plastic bag containing thirty ecstasy[3] pills in his pocket. With the defendant still prone on the floor, two officers searched the closet to look for a weapon. The closet was dark and messy, and the officers needed flashlights to conduct the search. After looking for five to ten minutes, they recovered no weapon but discovered a bag near where the defendant had been hiding containing three plastic bags of ecstasy pills. One bag contained seven pills, one bag contained twenty pills, and the third bag contained 132 pills. The pills retrieved from the closet, like the pills found in the defendant's pocket, all had the letter "G" imprinted on one side and the silhouette of a woman imprinted on the other side.

The record reveals the following additional procedural history. Prior to trial, the defendant filed a motion to suppress the drugs found both in the closet and on his person. The trial court held an evidentiary hearing, at which only the state presented witnesses. The court thereafter denied the motion to suppress, concluding that the searches were constitutionally permissible. With respect to the search of the closet, the trial court found that the defendant had been lying a "short distance" from the closet at the time the police searched therein.[4] The court further found that Pinto and Rivera had gone into the closet to look for a weapon after the defendant had been handcuffed.[5] Nonetheless, the court found that, "it [was] not inconceivable that [the defendant] may have grabbed for a gun" and therefore the officers were justified in searching the immediate surrounding area for weapons. The trial court held that the search of the closet was a lawful search incident to arrest, relying in part on *State* v. *Fletcher*, 63 Conn. App. 476, 777 A.2d 691, cert. denied, 257 Conn. 902, 776 A.2d 1152 (2001), a case in which the defendant also had been handcuffed during a search of a closet that was deemed a valid search incident to an arrest.[6]

Following trial, the jury returned a verdict of guilty of both counts alleging possession of an amphetamine-type substance with intent to sell and possession of an amphetamine-type substance with intent to sell within

1500 feet of a school. See footnote 1 of this opinion. The trial court thereafter rendered judgment in accordance with the verdict and imposed a total effective sentence of eighteen years imprisonment.[7] This appeal followed.

## I

We begin with the defendant's challenge to the trial court's decision denying his motion to suppress. The defendant has abandoned his challenge to the seizure of the pills from his person, limiting his claim on appeal to the pills seized from the closet. The defendant claims that the search of the closet was unlawful under the fourth and fourteenth amendments to the United States constitution and that, because the drugs found in the closet were the fruit of an illegal search, he is entitled to a new trial. Relying on *Chimel* v. *California*, 395 U.S. 752, 89 S. Ct. 2034, 23 L. Ed. 2d 685 (1969),[8] and *Arizona* v. *Gant*, 556 U.S. 332, 129 S. Ct. 1710, 173 L. Ed. 2d 485 (2009),[9] the defendant argues that a search incident to arrest is invalid if the search extends beyond the area "under [an arrestee's] immediate control";[10] (internal quotation marks omitted) *Chimel* v. *California*, supra, 764; and that officers may not search "[i]f there is no possibility that an arrestee could reach" that area. *Arizona* v. *Gant*, supra, 339. The defendant argues that *Gant* clarified *Chimel* to set a standard under which a search incident to an arrest may take place only when the arrestee is unsecured and within reaching distance of the area searched. The defendant argues that this standard was not satisfied in the present case because: (1) he was lying facedown on the floor, facing away from the closet, with his hands handcuffed behind his back when the officers searched the closet; (2) there were five or six officers, some armed, surrounding him in the small bedroom; (3) he was approximately eight feet away from the deepest part of the closet where the drugs were found; and (4) the closet was dark, messy and awkwardly shaped. The defendant further contends that the police officers' testimony indicated that the search was not for the officers' protection in that they admitted to searching for a gun for five to ten minutes after the defendant was secured and that such a weapon search was routine procedure. Finally, the defendant argues that *State* v. *Fletcher*, supra, 63 Conn. App. 476; see footnote 6 of this opinion; on which the trial court had relied, is factually distinguishable or, in the alternative, should be overruled in light of *Gant*.

In response, the state argues that, under *State* v. *Fletcher*, supra, 63 Conn. App. 476, the area within the defendant's immediate control includes a closet within four feet of a handcuffed defendant. The state therefore argues that the search of the closet in the present case "fell squarely within the authority of *Fletcher* and the trial court properly relied upon it in denying the defendant's motion to suppress." The state further argues that the defendant's reliance on *Gant* as rendering

*Fletcher* no longer good law is misplaced. The state acknowledges the holding in *Gant* that a search is invalid if conducted after the arrestee has been secured and cannot access the area searched, but questions whether *Gant* extends beyond automobile searches. It contends, however, that even if it does, *Gant* is factually distinguishable because there was no threat to officer safety in *Gant*, as there was in the present case.[11] In the alternative, the state argues that any error in denying the motion to suppress was harmless beyond a reasonable doubt because the jury had before it credible evidence that the defendant possessed and intended to sell the thirty pills found in his pocket. With respect to this alternative ground, the defendant contends that the jury could not have determined whether the pills in his pocket were for sale or personal use because the state did not produce evidence of the potency of the ecstasy pills seized.

In our view, there is no doubt that, given the defendant's criminal history; see footnote 11 of this opinion; the police officers had a reasonable basis to believe that the defendant may have had a weapon in the closet. Moreover, given the defendant's lack of compliance with the officers at the scene, it was reasonable for the officers to assume that, even after being restrained, the defendant might act irrationally by attempting to access the closet to obtain a weapon if one had in fact been hidden there.[12] See *United States* v. *McConney*, 728 F.2d 1195, 1207 (9th Cir. 1984) ("*Chimel* does not require the police to presume that an arrestee is wholly rational. Persons under stress may attempt actions which are unlikely to succeed."), overruled on other grounds by *Estate of Merchant* v. *Commissioner Internal Revenue Service*, 947 F.2d 1390, 1392–93 (9th Cir. 1991).

Nonetheless, the facts present a close case as to whether there was a realistic possibility that the defendant could have gained access to the closet interior such that it could be said to be within the defendant's immediate control under *Chimel*. Because the defendant was surrounded by four police officers, some of whom were armed, and was lying facedown with his hands cuffed behind his back, it would have been extremely difficult for the defendant to gain access to the small closet in which two more officers were located, let alone access a weapon therein. The remoteness of this possibility seems to be supported by the fact that the officers continued to search the closet for up to ten minutes while leaving the defendant in close proximity rather than removing him from the scene.

We also acknowledge that the law is unsettled on what it means for an area to be within an arrestee's immediate control. In particular, courts disagree over whether there must be some realistic possibility that the defendant would be able to reach the area searched at the time of the search or whether such a possibility

only need to have existed at the time of arrest.[13] Moreover, federal courts are split as to whether *Gant* established a more limited search incident to arrest standard that is applicable in all contexts or is limited to automobile searches. See *United States* v. *Curtis*, 635 F.3d 704, 713 n.22 (5th Cir. 2011) (acknowledging split of authority); *United States* v. *Brewer*, 624 F.3d 900, 905–906 (8th Cir. 2010) (declining to apply *Gant* to search of arrestee's person), cert. denied,     U.S.     , 131 S. Ct. 1805, 179 L. Ed. 2d 670 (2011); *United States* v. *Shakir*, 616 F.3d 315, 318 (3d Cir.) (concluding *Gant* applies beyond automobile searches), cert. denied,     U.S.     , 131 S. Ct. 841, 178 L. Ed. 2d 571 (2010).

Ultimately, we conclude that the present case does not require us to weigh in on this debate. Even if we assume, without deciding, that the facts and the law should have led the trial court to suppress the evidence seized from the closet, we are fully convinced that any improper admission of the evidence is harmless beyond a reasonable doubt in light of the unchallenged evidence seized from the defendant's person.

"It is well settled that constitutional search and seizure violations are not structural improprieties requiring reversal, but rather, are subject to harmless error analysis." *State* v. *Esarey*, 308 Conn. 819, 832, 67 A.3d 1001 (2013). Accordingly, we often have declined to decide fourth amendment issues attendant to the legality of a search or seizure when it is clear that any "erroneous admission into evidence of the fruits of the search was harmless beyond a reasonable doubt." (Internal quotation marks omitted.) Id. "The harmless error doctrine is rooted in the fundamental purpose of the criminal justice system, namely, to convict the guilty and acquit the innocent. . . . Therefore, whether an error is harmful depends on its impact on the trier of fact and the result of the case. . . . This court has held in a number of cases that when there is independent overwhelming evidence of guilt, a constitutional error would be rendered harmless beyond a reasonable doubt . . . [but] the state bears the burden of proving that the error was harmless . . . . [W]e must examine the impact of the evidence on the trier of fact and the result of the trial. . . . If the evidence may have had a tendency to influence the judgment of the jury, it cannot be considered harmless. . . . That determination must be made in light of the entire record [including the strength of the state's case without the evidence admitted in error]." (Citations omitted; internal quotation marks omitted.) *State* v. *Mitchell*, 296 Conn. 449, 459–60, 996 A.2d 251 (2010).

In considering the strength of the state's case, we are mindful that intent is often proved by circumstantial evidence. See *State* v. *Lewis*, 303 Conn. 760, 770, 36 A.3d 670 (2012); *State* v. *Baldwin*, 224 Conn. 347, 355, 618 A.2d 513 (1993). While "[t]he quantity of narcotics

found in the defendant's possession [is] probative of whether the defendant intended to sell drugs"; (internal quotation marks omitted) *State* v. *Francis*, 90 Conn. App. 676, 682, 879 A.2d 457, cert. denied, 275 Conn. 925, 883 A.2d 1248 (2005); so too is "evidence that the defendant had been a seller of narcotics in the past . . . ." *State* v. *Baldwin*, supra, 355; see also *State* v. *Jordan*, 135 Conn. App. 635, 647–48, 42 A.3d 457 (prior misconduct evidence admissible to prove intent), cert. granted, 305 Conn. 918, 47 A.3d 388 (2012). Evidence of a defendant's prior sales of narcotics "is relevant to the nature of his possession of the drug at the time of the alleged offense." (Internal quotation marks omitted.) *State* v. *Baldwin*, supra, 355.

We acknowledge that the state contended in its closing argument that the collective quantity of pills seized from both the defendant's person and the closet "in and of itself" proved the defendant's intent to sell. Nonetheless, the state offered ample additional circumstantial evidence that proved beyond a reasonable doubt that the defendant intended to sell the thirty pills he possessed on his person at the time of his arrest, irrespective of the pills seized from the closet, and that no rational juror could reach a different conclusion.

The state's expert witnesses provided uncontradicted testimony regarding the nature of ecstasy and its general use and sale. That testimony established that ecstasy is the street name for pills containing Methylenedioxyamphetamine, also known as MDA. Ecstasy is a schedule 1 drug, as it has no known medical use. The pills are not produced by pharmaceutical companies, but by drug dealers. Although the potency of a pill can vary depending on the amount of MDA included in the mixture, the normal dosage is 80 to 120 milligrams. A typical user of ecstasy will purchase one or two pills at a time to take over the course of a single night. The high from one ecstasy pill typically lasts four to six hours. Drug dealers often imprint a specific stamp on a pill to ensure that, if the buyer likes that particular product, he or she will return to buy that same pill again.

The state also offered the following evidence specific to the defendant. The thirty pills found on the defendant appeared to be the typical dose of ecstasy, and tests revealed the presence of MDA, although no quantitative analysis was done to determine the specific amount of MDA in the pills. The pills had the letter "G" imprinted on one side and the silhouette of a woman stamped on the other side. Two women who had known the defendant prior to his arrest testified that they had seen him in possession of, and selling, ecstasy pills in the past with those same markings. Toni Stevens stated that she had seen the defendant sell three to five pills per transaction to various persons. Jennifer Campbell stated that she had seen the defendant sell the pills for $10 to $15 each, in strip clubs and other unspecified

places. Both women stated that they had used these ecstasy pills supplied by the defendant. Campbell's high from these pills lasted six to ten hours, while Stevens' high lasted a "couple hours."

In light of this evidence, we are convinced that the state proved beyond a reasonable doubt that the thirty pills found in the defendant's pocket were not for his personal use, and that the assumedly inadmissible evidence was so relatively insignificant that there is no reasonable possibility that its improper admission affected the jury's verdict. In other words, we are satisfied beyond a reasonable doubt that the result would be the same without the admission of the assumedly improper evidence. Indeed, nothing about the facts is consistent with the conduct of a user of the drug, and everything about the facts is consistent with the conduct of a seller of the drug. On the basis of a typical user's conduct and the prices that the defendant previously had charged, the defendant was carrying on him a fifteen to thirty day supply of the drug, with an approximate street value of $300 to $450. His supply contained identical markings to pills he previously had sold, consistent with a drug dealer soliciting repeat business. The pills in the closet were merely cumulative of the state's overwhelming evidence of the defendant's intent to sell the pills in his pocket.

The *only* argument advanced by the defendant to rebut this clear and persuasive evidence is that the jury might have concluded that the thirty pills were for his personal use because there was no proof that the pills were of normal potency. According to the defendant, because ecstasy pills are homemade, the amount of MDA in the pills seized from his pocket could have been much lower than in the typical ecstasy pill. The defendant posits that the pills seized could have contained an amount of MDA that would require ten pills to obtain the effect of one typical pill, thus effectively rendering him in possession of the equivalent of three pills of a normal dosage. Without evidence of the pills' dosage, the defendant argues that the jury would have to engage in speculation and conjecture to determine if possession of thirty pills was consistent with personal use or with an intent to sell. We are not persuaded.

Even if the pills were diluted, it would not follow that there exists a reasonable possibility that the defendant had no intent to sell them. Because the pills in his possession bore the same markings as the ones the defendant previously had sold, their street value undoubtedly remained the same as the other pills. Furthermore, the defendant's argument ignores that the jury did have before it evidence from which it could infer the general potency of the pills in the defendant's possession: Campbell testified that her high from one "G-lady" pill obtained from the defendant lasted approximately six to ten hours, and Stevens testified that her

high lasted a "couple hours." Although this testimony suggests that the pills may have affected people differently or may have been of varying degrees of potency, it is consistent with the state's expert testimony that various literature indicates that the typical high from ecstasy lasts anywhere from three to ten hours. Accordingly, even if we assume that the pills found in the closet were not seized pursuant to a valid search incident to an arrest, we conclude that their admission into evidence was harmless error that did not affect the verdict in this case.

## II

We now turn to the defendant's claim that his convictions of possession of an amphetamine-type substance with intent to sell by a person who is not drug-dependent and possession of an amphetamine-type substance within 1500 feet of a school must be vacated because the evidence is insufficient to sustain the convictions. With regard to the charge of possession with intent to sell, the defendant argues that there was no evidence that he knew of, or exercised control over, the pills in the closet and no evidence that he intended to sell the pills in his pocket. With regard to the charge of possession with intent to sell within 1500 feet of a school, the defendant argues that the state offered no evidence that he intended to sell the pills at 555 Congress Avenue or anywhere else within 1500 feet of the elementary school near that location. The state concedes that the evidence was insufficient to show possession with intent to sell within 1500 feet of a school, but argues that the evidence was sufficient to convict the defendant for possession with intent to sell. For the reasons set forth in part I of this opinion, we conclude that the evidence was sufficient to show possession of an amphetamine-type substance with intent to sell, solely on the basis of the thirty pills found in the defendant's pocket. For the reasons that follow, we agree with the parties that the evidence was insufficient to show possession of an amphetamine-type substance with intent to sell within 1500 feet of a school.

"In reviewing a sufficiency of the evidence claim, we apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [trier of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . . In evaluating evidence, the trier of fact is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. . . . The trier may draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical. . . . This does not require that each subordinate conclusion established by or inferred from the

evidence, or even from other inferences, be proved beyond a reasonable doubt . . . because this court has held that a [trier's] factual inferences that support a guilty verdict need only be reasonable." (Internal quotation marks omitted.) *State* v. *Butler*, 296 Conn. 62, 76, 993 A.2d 970 (2010).

To sustain a conviction for possession of an amphetamine-type substance with intent to sell within 1500 feet of a school, the state must have presented evidence proving that the defendant had the intent to sell the pills found on his person at some location within that proscribed zone. See *State* v. *Lewis*, supra, 303 Conn. 771. "Quite obviously, if [a person] is apprehended while coincidentally passing through a location, there is no logical inference that he intended to sell at the location of the apprehension." (Internal quotation marks omitted.) Id., 773. In the present case, the defendant was apprehended within the proscribed school zone in possession of a quantity of pills consistent with an intent to sell. The state presented no evidence, however, from which an inference could be drawn that the defendant intended to sell the pills at 555 Congress Avenue or anywhere else within 1500 feet of the nearby elementary school. Indeed, the only evidence regarding the defendant's past drug sales was that they had occurred at strip clubs and other unspecified locations. Accordingly, although the evidence was sufficient for the jury to convict the defendant of possession with intent to sell, it was insufficient to support a conviction for possession of an amphetamine-type substance with intent to sell within 1500 feet of a school.

### III

Finally, we turn to the defendant's claim of prosecutorial impropriety. The defendant contends that Senior Assistant State's Attorney Terence Mariani made improper statements during his rebuttal argument by: (1) improperly expressing his personal opinion about the merits of the defendant's claims and vouching for the credibility of the police officers; (2) appealing to the jury's emotions; and (3) referring to facts not in evidence. The defendant contends that his convictions must be reversed because these improprieties denied him a fair trial. Should this court conclude that Mariani's remarks, though improper, did not deprive the defendant of a fair trial, the defendant contends his convictions should be reversed pursuant to this court's supervisory powers because of a pattern of misconduct by Mariani in other cases. We conclude that the defendant was not deprived of a fair trial, and we decline to exercise our supervisory powers to reverse the defendant's convictions.

The record reveals the following additional facts. In his closing argument, defense counsel advanced the theory that the officers considered the defendant to be a "bad guy," and all but stated that, for that reason,

the officers had planted drugs on the defendant that actually belonged to Richard in order to "tack on a possession charge." Defense counsel also sought to discredit Stevens and Campbell by suggesting that they each had pending charges for which they were seeking favorable treatment from the state. Specifically, in seeking to discredit Campbell, defense counsel stated that the state had made an offer of accelerated rehabilitation to her. Mariani objected, arguing that defense counsel was referring to information that was neither in evidence nor true because Judge Damiani, not the state, had given Campbell accelerated rehabilitation. The court then reminded counsel that arguments are confined to the evidence.

In his rebuttal argument, Mariani made the following remarks, with the emphasized comments indicating those to which the defendant has objected on appeal: "You know, that—*that really is outrageous*, if you think about it. Here's police officers . . . Ponzillo, [James] Masterson [of the United States Marshal Service] . . . Deely . . . Rivera, *sworn police officers, run around the city trying to catch bad guys* and they come in and testify about what happened on a particular day—and he won't come right out and say it, but what—what's he saying? It's a lie. The police officers all came in here and perjured themselves because they wanted to get to [the defendant]. *That—that's what they get for their hard work.* Accused of being liars, planting evidence and making up not—not only making up lies and putting them in a police report, but coming in here and swearing under oath and committing perjury. Person, after person, after person committing perjury to get to [the defendant]. *Give me a break. That's—that's what they get for their hard work in this city to have a defense attorney stand up here and say, they're all liars. Poor* [*defendant*], *he's a victim of circumstance. Give me a break.* . . .

"And he comes in here, [the] defense attorney, and argues things, that are not before you, why . . . Campbell got accelerated rehabilitation. *That was never the state's recommendation.* . . . There's a lot of things— a lot of things that go on while you people are in that jury room and the reason they go on while you're in the jury room is because you're not supposed to know exactly what's going on because the evidence that's allowed in front of you comes in front of you. *It's not for the defense attorney to try and leak out a couple of things and make you think that one thing happened when maybe something very different happened here in court. So don't believe that nonsense.*

"And here's the other thing. I mean, not—not only are the Waterbury police officers and the United States Marshals and, I guess, the Stratford police and the Bridgeport police, because, to some extent, they all confirmed the drugs were found in that room. They're

all corrupt and they're all so stupid that they couldn't get their stories straight when they were going to come in here and perjure themselves. That's the defense.

"Well, how about this, how about this. How about the fact that a month or two before, both . . . Campbell and . . . Stevens were in his presence and saw him with the same kinds of pills. *Oh, what a fantastic coincidence. Thank God that all came together so the police's lie could be supported. The only reasonable explanation here is that the police officers were telling the truth. How could they have known—how could they have possibly known that those G-lady pills, G on one side and a naked lady or a lady silhouette on the other, were going to match up to what other witnesses had seen him with just* [*five*], [*six*] *weeks before? Come on.*

"*This case is a slam dunk.* The evidence is in. *Don't let the defense attorney distract you* by, you know, trying to suggest that some underhanded things went on that you weren't aware of.

"*And don't believe, for a second, you saw the witnesses testify, that these police officers would come in here and risk their careers for the likes of* [*the defendant*], *don't believe that.*" (Emphasis added.)

Our case law on the scope of proper argument recognizes a balance that must be struck. "[P]rosecutorial [impropriety] of a constitutional magnitude can occur in the course of closing arguments. . . . When making closing arguments to the jury, [however] [c]ounsel must be allowed a generous latitude in argument, as the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of argument. . . . Thus, as the state's advocate, a prosecutor may argue the state's case forcefully, [provided the argument is] fair and based [on] the facts in evidence and the reasonable inferences to be drawn therefrom." (Internal quotation marks omitted.) *State* v. *Maguire*, 310 Conn. 535, 553, 78 A.3d 828 (2013).

"In analyzing claims of prosecutorial impropriety, we engage in a two step analytical process. . . . The two steps are separate and distinct. . . . We first examine whether prosecutorial impropriety occurred. . . . Second, if an impropriety exists, we then examine whether it deprived the defendant of his due process right to a fair trial. . . . In other words, an impropriety is an impropriety, regardless of its ultimate effect on the fairness of the trial. Whether that impropriety was harmful and thus caused or contributed to a due process violation involves a separate and distinct inquiry." (Internal quotation marks omitted.) *State* v. *Stephen J. R.*, 309 Conn. 586, 605, 72 A.3d 379 (2013).

We conclude that the majority of the statements challenged by the defendant fell within the bounds of fair argument, and therefore limit our discussion to those

statements that exceeded those bounds. The state concedes that Mariani's comments about the hard work of the police were improper. Such statements improperly tend to suggest to the jury that it should credit the officers' testimony due to those efforts rather than make an unbiased determination as to the officers' credibility and whether the evidence established the defendant's guilt beyond a reasonable doubt. See *United States* v. *Aguilar*, 645 F.3d 319, 324 (5th Cir. 2011) (The court concluded that it was improper to argue that police officers "go out there every day and do their job . . . strive to protect people like you and me . . . put their [lives] on the line, protecting us and our kids. And what do they get for it? They get to come into the courtroom and be called a liar." [Internal quotation marks omitted.]); see also *State* v. *Singh*, 259 Conn. 693, 721–23, 793 A.2d 226 (2002) (concluding that it was improper for prosecutor to appeal to jury to decide case out of sense of duty to state).

Although the state does not concede that the argument that the officers would not have placed their careers in jeopardy by lying was improper, we conclude otherwise. The state is correct that a prosecutor properly may argue that a witness has no motive to lie. See *State* v. *Warholic*, 278 Conn. 354, 365, 897 A.2d 569 (2006). That is not, however, what the prosecutor did in this case. Had Mariani connected these comments to a lack of motive to lie because the police were arresting the defendant for felony charges that, in and of themselves, carried substantial penalties, the state's argument might be more persuasive. The comments in this case, however, were virtually identical to ones that have been recognized as improperly vouching for the credibility of the witness if there is no evidence to support the government's assertion regarding the officer's potential loss of career. See *United States* v. *Boyd*, 54 F.3d 868, 871 (D.C. Cir. 1995) (citing various cases for this proposition); see also *United States* v. *Weatherspoon*, 410 F.3d 1142, 1146 (9th Cir. 2005) ("[T]he prosecutor . . . clearly urged that the existence of legal and professional repercussions served to ensure the credibility of the officers' testimony. That suffices for the statement to be considered improper as vouching based upon matters outside the record . . . ." [Citations omitted.]); *Spain* v. *State*, 386 Md. 145, 154, 872 A.2d 25 (2005) (prosecutor transcended boundaries of proper argument by asserting that false testimony would expose officer to penalties of perjury and lead to adverse consequences to his career as police officer).

The state also concedes that Mariani improperly referred to facts not in evidence when referring to the fact that it was Judge Damiani, and not the state, who had offered Campbell accelerated rehabilitation. See *State* v. *Singh*, supra, 259 Conn. 717 ("[s]tatements as to facts that have not been proven amount to unsworn testimony" [internal quotation marks omitted]); *State*

v. *Williams*, 204 Conn. 523, 544, 529 A.2d 653 (1987) ("[a] prosecutor, in fulfilling his duties, must confine himself to the evidence in the record"). We agree with the state that, although defense counsel first referred to this matter, the proper course would have been for Mariani to ask the trial court to strike the improper matter and to ask for a curative instruction rather than to respond in kind.

Having concluded that the aforementioned comments were improper, we turn to the question of whether these comments deprived the defendant of a fair trial. In resolving this question, "we ask whether the prosecutor's conduct so infected the trial with unfairness as to make the resulting conviction a denial of due process. . . . We do not, however, focus only on the conduct of the state's attorney. The fairness of the trial and not the culpability of the prosecutor is the standard for analyzing the constitutional due process claims of criminal defendants alleging prosecutorial [impropriety]. . . . To determine whether the . . . impropriety deprived the defendant of a fair trial, we must examine . . . [several] factors." (Citations omitted; internal quotation marks omitted.) *State* v. *Fauci*, 282 Conn. 23, 50–51, 917 A.2d 978 (2007). Among them are "the extent to which the [impropriety] was invited by defense conduct or argument . . . the severity of the [impropriety] . . . the frequency of the [impropriety] . . . the centrality of the [impropriety] to the critical issues in the case . . . the strength of the curative measures adopted . . . and the strength of the state's case." (Internal quotation marks omitted.) *State* v. *Maguire*, supra, 310 Conn. 560; see *State* v. *Williams*, supra, 204 Conn. 540 (setting forth these factors).

Although a defendant need not object to prosecutorial impropriety to preserve such a claim for review, "[t]his does not mean . . . that the absence of an objection at trial does not play a significant role in the application of the [*Williams*] factors. To the contrary, the determination of whether a new trial or proceeding is warranted depends, in part, on whether defense counsel has made a timely objection to any [incident] of the prosecutor's improper [conduct]. When defense counsel does not object, request a curative instruction or move for a mistrial, he presumably does not view the alleged impropriety as prejudicial enough to jeopardize seriously the defendant's right to a fair trial." (Internal quotation marks omitted.) *State* v. *Maguire*, supra, 310 Conn. 560–61.

In the present case, defense counsel did not object, request a curative instruction or move for a mistrial. Moreover, we are not persuaded that the *Williams* factors as a whole weigh in the defendant's favor. See id., 561 (concluding that prosecutor's improprieties violated defendant's right to due process when "the only consideration that weighs in favor of the state is defense

counsel's failure to object to all but one of the claimed improprieties"). Mariani's reference to a fact not in evidence was in direct response to a similar statement by defense counsel. Mariani's other improper statements about the police witnesses, however, were not invited. Nonetheless, the improprieties occurred in rebuttal argument and were not frequent when viewed in the context of the entire closing argument.

Although we are troubled by Mariani's improper vouching for the officers' credibility in tandem with the suggestion that the officers' hard work imposed an attendant duty on the jury to credit the officers' testimony given the importance of the officers' testimony to the case, the trial court gave a specific instruction to the jury regarding these witnesses. Specifically, the court pointed to the testimony of the officers, underscored that a police officer's testimony is not entitled to any special weight, and directed the jury to determine the credibility of the officers in the same way and by the same standards as it evaluated other witnesses. Finally, the state's evidence was relatively strong, and the defendant's theory that the officers had planted the pills on him was simply not credible in light of the circumstances. The pills found on the defendant's person bore identical markings to those he previously had sold, the plastic bag found on the defendant was not the one containing the largest quantity of pills, and the defendant already was subject to an arrest warrant on multiple felony offenses. Accordingly, we conclude that the defendant was not deprived of a fair trial.

The defendant nonetheless asks this court to exercise its supervisory authority to order a new trial because Mariani's improper statements in the present case are part of a larger, persistent pattern of improprieties by him. As the state points out, however, the Appellate Court recently took that very action in reversing a conviction obtained by Mariani when the improprieties did not rise to the level of a due process violation. See *State* v. *Santiago*, 143 Conn. App. 26, 47, 66 A.3d 520 (2013) ("Mariani knew or should have known that his comments exceeded the proper bounds of argument, and the similarity of the statements that he made here to those that previously were deemed improper by this court or our Supreme Court indicates that the misconduct was deliberate. Mariani's misconduct was typical of a larger pattern of misconduct that is not likely to be corrected absent extreme measures."). The state has not appealed from that judgment. The members of this court have every reason to expect that the extraordinary action by the Appellate Court with respect to Mariani's conduct in *Santiago* will serve its clearly intended purpose. Therefore, we decline to take such an extraordinary action in the present case in the interests of justice. See *State* v. *Payne*, 260 Conn. 446, 450–51, 797 A.2d 1088 (2002) (explaining extraordinary circumstances justifying exercise of supervisory authority to reverse

conviction in absence of constitutional violation).

## IV

In light of our conclusion in part II of this opinion, the defendant is entitled to a judgment of acquittal on his conviction of possession of an amphetamine-type substance with intent to sell within 1500 feet of a school. The defendant was sentenced to a three year term of imprisonment on that offense, to be served consecutive to his sentence for his conviction of possession of an amphetamine-type substance with intent to sell. "Pursuant to [the aggregate package theory of sentencing], we must vacate a sentence in its entirety when we invalidate any part of the total sentence. On remand, the resentencing court may reconstruct the sentencing package or, alternatively, leave the sentence for the remaining valid conviction or convictions intact. . . . Thus, we must remand this case for resentencing on the [remaining] count[s] on which the defendant stands convicted." (Citation omitted.) *State* v. *Miranda*, 274 Conn. 727, 735 n.5, 878 A.2d 1118 (2005).

The judgment is reversed only with respect to the defendant's conviction of possession of an amphetamine-type substance within 1500 feet of a school and the case is remanded with direction to render judgment of acquittal on that charge and to resentence the defendant on the remaining charges; the judgment is affirmed in all other respects.

In this opinion ROGERS, C. J., and PALMER, ZARELLA, EVELEIGH and ROBINSON, Js., concurred.

[1] The defendant was also convicted of interfering with an officer in violation of General Statutes § 53a-167a. The defendant does not challenge his conviction of that offense.

[2] The defendant appealed to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-2.

[3] Ecstasy is the street name for a pill containing an amphetamine-type substance.

[4] At the suppression hearing, Ponzillo testified that, once the defendant was arrested, he was "maybe two to three feet" away from the *opening* of the closet. Rivera estimated that the defendant was at least seven feet away from the *back* of the closet.

[5] Although Pinto's testimony at the suppression hearing was vague, he testified at trial that he did not wait to see that the defendant was secured but rather began to search the closet as soon as the defendant was extricated from it. Rivera testified that he began to search after the defendant was handcuffed.

[6] In *State* v. *Fletcher*, supra, 63 Conn. App. 481–82, the Appellate Court concluded that the search of a closet located within four feet of a handcuffed defendant was a lawful search incident to arrest. In affirming the trial court's decision denying the defendant's motion to suppress the narcotics and guns found in the closet, the Appellate Court concluded that the distance between the defendant and the closet did not suggest that "it would have been physically impossible" for the defendant to reach inside the closet. Id. The Appellate Court concluded that it was irrelevant that the defendant was handcuffed because "it [was] not inconceivable that he may have grabbed for a gun . . . ." (Internal quotation marks omitted.) Id., 482. That opinion does not indicate whether the defendant's hands had been cuffed in front of or behind his body, or the number of officers guarding the defendant during the search.

[7] The court imposed the following sentence: a fifteen year term of imprisonment on count one, possession of an amphetamine-type substance with

intent to sell by a person who is not drug-dependent in violation of § 21a-278 (b); a three year term of imprisonment on count two, possession of an amphetamine-type substance with intent to sell within 1500 feet of a school in violation of § 21a-278a (b), to be served consecutive to count one; and a term of one year imprisonment on count three, interfering with an officer in violation of General Statutes § 53a-167a, to be served concurrent to the first count.

[8] In *Chimel* v. *California*, supra, 395 U.S. 763, the United States Supreme Court held that it is "reasonable for [an] arresting officer to search the person arrested in order to remove any weapons that the latter might seek to use in order to resist arrest or effect his escape," as well as "to search for and seize any evidence on the arrestee's person in order to prevent its concealment or destruction." The court further held that it is reasonable for arresting officers to search "the area into which an arrestee might reach in order to grab a weapon or evidentiary items" because a "gun on a table or in a drawer in front of one who is arrested can be as dangerous to the arresting officer as one concealed in the clothing of the person arrested." Id. But the court cautioned that a warrantless search incident to arrest is only permissible "where the weapon or evidence is on the accused's person or under his immediate control." (Internal quotation marks omitted.) Id., 764.

[9] In *Arizona* v. *Gant*, supra, 556 U.S. 335, the defendant was arrested for driving with a suspended license, and after he was handcuffed and locked in the back of a police car, officers searched his car and found cocaine in the pocket of a jacket in the backseat. Relying on *Chimel*, the court held that a search of a vehicle incident to arrest is only permissible when the arrestee is unsecured and within reaching distance of the passenger compartment at the time of the search; id., 343; and that "[i]f there is no possibility that an arrestee could reach into the area that law enforcement officers seek to search, [the] justifications for the search-incident-to-arrest exception are absent and the rule does not apply." Id., 339.

[10] The defendant further contends that courts have used certain factors to determine what constitutes an area within the defendant's immediate control. These factors are: "(1) the distance between the arrestee and the place searched; (2) whether the arrestee was handcuffed or otherwise restrained; (3) whether police were positioned so as to block the arrestee from the area searched; (4) the ease of access to the area itself; and (5) the number of officers." (Internal quotation marks omitted.) *State* v. *LaMay*, 140 Idaho 835, 838, 103 P.3d 448 (2004).

[11] Specifically, the state points out that the defendant in *Gant* had no known violent history, he calmly approached the officers when asked to do so, he was arrested ten to twelve feet from the car the officers searched, and the officers waited to search the vehicle until after the defendant had been handcuffed and placed in the back of a guarded police cruiser. By contrast, the state points out that in the present case: (1) the officers were looking to serve warrants on a violent felon; (2) the defendant was known to have used weapons in the recent and distant past, as evidenced by his actions underlying a prior manslaughter conviction and in a recent robbery; (3) the defendant was located in a small, dark closet within a small bedroom; (4) the defendant had hid to avoid detection; (5) the defendant pushed the officers as they tried to pull him out of the closet; (6) the defendant was less than one foot from the closet door entrance when the search first commenced; and (7) the closet was searched within seconds of the defendant being handcuffed and placed on the floor.

[12] We also recognize that in light of the dangerousness associated with custodial arrests, courts must be careful in second-guessing officers' judgments regarding whether an area is within an arrestee's immediate control and whether there is some possibility that an arrestee might reach that area to obtain a weapon. See *Washington* v. *Chrisman*, 455 U.S. 1, 7, 102 S. Ct. 812, 70 L. Ed. 2d 778 (1982) ("[e]very arrest must be presumed to present a risk of danger to the arresting officer"); *United States* v. *Shakir*, 616 F.3d 315, 319 (3d Cir.) ("where, in the heat of an arrest, an officer concludes that a particular item is within the arrestee's grasp, courts are extremely reluctant to subsequently determine that the officer's conclusion was unreasonable and thereby suppress whatever evidence may have been found" [internal quotation marks omitted]), cert. denied,      U.S.     , 131 S. Ct. 841, 178 L. Ed. 2d 571 (2010); *United States* v. *Lyons*, 706 F.2d 321, 330 (D.C. Cir. 1983) ("[c]ustodial arrests are often dangerous; the police must act decisively and cannot be expected to make punctilious judgments regarding what is within and what is just beyond the arrestee's grasp").

[13] Compare *Northrop* v. *Trippett*, 265 F.3d 372, 379 (6th Cir. 2001) (lack

of accessibility at time of search does not invalidate search, so long as arrestee had item in his immediate control "near the time of his arrest"), *United States* v. *Clemons*, United States Court of Appeals, Docket No. 95-5162 (4th Cir. December 11, 1995) (upholding search of luggage as incident to arrest when arrestee was secured at time of arrest and could not access luggage), *United States* v. *Turner*, 926 F.2d 883, 888 (9th Cir. 1991) (upholding search of room incident to arrest when defendant was handcuffed and removed from room before search), and *United States* v. *Palumbo*, 735 F.2d 1095, 1097 (8th Cir. 1984) (search incident to arrest is "not constrained because the arrestee is unlikely at the time of arrest to actually reach into that area"), with *United States* v. *Myers*, 308 F.3d 251, 267 (3d Cir. 2002) (search invalid because arrestee would have had to possess qualities of acrobat or Houdini to access bag when handcuffed behind back, lying face-down on floor and "covered" by two armed police officers); *United States* v. *Johnson*, 16 F.3d 69, 71–72 (5th Cir.) (invalidating search of briefcase because, although arrestee was not handcuffed, briefcase was not in arrestee's immediate control when numerous officers stood between arrestee and briefcase), decision clarified on rehearing, 18 F.3d 293 (1994), and *United States* v. *Lyons*, 706 F.2d 231, 330 (D.C. Cir. 1983) ("[t]o determine whether a warrantless search incident to an arrest exceeded constitutional bounds, a court must ask: was the area in question, at the time it was searched, conceivably accessible to the arrestee—assuming that he was neither an acrobat [nor] a Houdini ?" [footnote omitted; internal quotation marks omitted]), quoting *United States* v. *Mapp*, 476 F.2d 67, 80 (2d Cir. 1973).

The concurring justice cites several cases wherein courts held that a search was valid even when the arrestee was handcuffed or otherwise unable to access the searched area. Not only do those cases predate *Gant* by several decades, they only further demonstrate that, while some courts have found that a search is valid even when the arrestee is unable to access the area at the time of the search, others have come to the opposite conclusion.

—————————————————